COLLINS, J.
INTRODUCTION
While driving under the influence of alcohol, appellant Lauro Lopez made a left *467 turn in front of an oncoming motorcycle, hitting and killing the rider. A jury convicted appellant of second degree murder and felony hit and run driving resulting in death or serious injury.
Appellant challenges his conviction in several ways. First, he argues that the trial court erred by admitting evidence of the advisement he received after a prior conviction for driving under the influence. Second, appellant raises several claims of error related to the jury instructions. Third, he contends his conviction on both counts must be overturned due to his counsel's concession at trial that appellant committed the hit and run, coupled with the absence of affirmative evidence that he knowingly waived his constitutional trial rights. Finally, he asserts cumulative error and sentencing error.
We conclude that defense counsel's statements during argument were tantamount to a guilty plea on the hit and run offense. Moreover, the record is silent as to whether appellant gave informed consent to waive his right to trial on this count. Under these circumstances and applying recent case law from the United States and the California Supreme Courts, we reverse the conviction on the hit and run charge. We otherwise affirm.
PROCEDURAL HISTORY
The Los Angeles County District Attorney charged appellant in an information with one count of second degree murder ( Pen. Code, § 187, subd. (a) ; count one)[1] and one count of felony hit and run driving resulting in death or serious injury to another person ( Veh. Code, § 20001, subd. (b)(2) ; count two). Appellant pled not guilty to both counts and the matter proceeded to jury trial.
The jury found appellant guilty on both counts. The court sentenced appellant to 15 years to life on the murder charge and three years on the hit and run charge, to run consecutively. Appellant timely appealed.
FACTUAL BACKGROUND
The following evidence was adduced at trial.
I. Prosecution Evidence
A. 2013 drunk driving conviction
Appellant was previously arrested for driving under the influence on January 7, 2013. He pled no contest to driving under the influence with a blood alcohol content of .08 percent or higher in violation of Vehicle Code section 23152, subdivision (b), and admitted as part of his plea that his blood alcohol level was actually .20 percent or higher. Before entering his plea, appellant signed a written advisement, which was also read to him by a Spanish interpreter. It included the following Watson[2] advisement: "I understand that being under the influence of alcohol or drugs or both impairs my ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both. If I continue to drive while under the influence of alcohol or drugs or both, and as a result of my driving someone is killed, I can be charged with murder." In addition, during the plea hearing, the judge repeated the Watson advisement.
The terms of appellant's plea required him to complete a nine-month alcohol education program and a Mothers Against Drunk Driving (MADD) victim impact program, and barred him from driving without *468 a valid driver's license or with any measurable amount of alcohol in his system. Appellant was placed on probation for three years.
Pursuant to the terms of his plea, appellant completed a nine-month alcohol program starting in February 2013. The program, given in Spanish, included 23 group sessions, six alcoholic education sessions, 10 interviews, and 19 Alcoholics Anonymous meetings. Upon completion, appellant filled out an exit form stating that he would not drink and drive.
In November 2013, appellant also attended a victim impact panel, an educational program for driving under the influence (DUI) offenders. He registered for and completed the course in English. As part of the program, the administrator testified that she discussed the Watson advisement with the participants and projected the text on a big screen. She would customarily tell the story of another class participant who attended the class twice and later caused an accident that killed two people.
B. 2015 accident
On October 13, 2015 at approximately 7:15 p.m., appellant approached the intersection of Soto Street and 57th Street in Huntington Park. He was driving his white pickup truck and his 29-year-old son was in the passenger seat. Appellant made a left turn onto 57th Street in front of an oncoming motorcycle. He struck the motorcycle, knocking its rider to the ground. Appellant then drove away from the scene.
A bystander called 911, reporting that "a guy came, took a left. And nailed a woman or man on a motorcycle." He described the vehicle as a white truck and told the operator where the truck was heading. The 911 call was played for the jury at trial.
Detective Garey Staal of the Huntington Park Police Department (HPPD) testified that he and his partner saw the motorcycle driving on Soto Street before the accident. The motorcycle was travelling a "little faster than the normal traffic but ... nothing that was concerning as far as speed." They came upon the scene of the accident and saw the same motorcycle on the ground. Detective Staal ran toward the victim on the ground and began performing CPR, assisted by others at the scene. Paramedics arrived less than five minutes later. The victim was transported to the hospital and died shortly thereafter from his injuries.
Staal and his partner gathered a description of the suspect vehicle and its direction of travel from witnesses at the scene; they broadcast that information over their police radio. The detectives also noticed a license plate lying in the street, which appeared to be the front license plate from the suspect vehicle. Staal's partner wrote down the license plate number and gave it to police dispatch; dispatch advised him that the vehicle with that plate number was registered to appellant.
A short time later, a police officer who had heard the collision and then heard about the suspect over the police radio spotted appellant's truck parked in a nearby business parking lot. As the officer walked over to the truck, he noticed appellant and his son standing in a yard next to the vehicle. The officer approached and asked in Spanish if either of them was driving the pickup truck. The officer testified at trial that in response, appellant pointed to his son, who shook his head no. The officer then called for assistance.
HPPD officer Martin Magallanes arrived a few moments later. He noted that the front license plate on appellant's truck was missing and the rear plate matched the number from the plate at the scene.
*469 He spoke to appellant in Spanish and testified that he could smell alcohol on appellant's breath. Appellant acknowledged to Magallanes that he had consumed three 24-ounce beers between 5:00 and 6:00 p.m. He stated he did not feel the effects of the alcohol, but Magallanes noticed appellant swaying. Appellant also admitted he had been driving. He told Magallanes that his truck did not have any mechanical problems and he knew he had collided with a motorcycle. He did not ask about the condition of the rider.
Magallanes administered a field sobriety test to appellant, which indicated appellant was impaired. Appellant was also given two breath tests, one at 8:10 and one at 8:12 p.m.; both showed his blood alcohol content was 0.14 percent. That result was confirmed by a blood draw taken at 8:30 p.m.[3] Appellant was arrested.
Magallanes interviewed appellant in jail that evening around 10:00 p.m. Appellant agreed he had "too many beers" and knew driving after drinking was a crime. He said he had one beer at work, then went to the liquor store to get beer, drove home, and drank "two big Modelos" at home. He told Magallanes that he was not planning to leave his house that night, but he decided to drive his son to a friend's house to see about a job. At the time of the accident, he saw the motorcycle approaching but thought he would be able to make the left turn safely before the collision. He did not see the motorcyclist after the crash. Appellant then left the scene because he was scared he would get arrested because he had been drinking. His son told him to remain at the scene. Appellant also stated he was not planning to report the collision that night because he was intoxicated.
HPPD detective Osvaldo Cervantes interviewed appellant on October 14, 2015. Excerpts from the video of that interview were played for the jury. Appellant reiterated that he drank three 24-ounce Modelo beers, finishing about an hour before the accident. When asked if he thought he was drunk, appellant responded, "Well, on the one hand, yes, but on the other hand I think-yes, I was a little. I'm not going to say no. But ... my kid was going ... and I thought it easier that I take the truck rather than him." The detectives also asked why appellant drove if he knew he was drunk. He responded, "that was my mistake." He said the admonition he received with his prior conviction was that "I wasn't to drive again with alcohol" and knew he couldn't drive for three years. He also knew he was still on probation from his prior conviction.
Appellant told the detectives that he was "going to make a left turn" and claimed he saw the other driver "coming at a high velocity on his motorcycle. But, there were no cars. He came hard." Appellant thought he was going to be able to turn in front of the motorcycle, but they collided. His son said "Wait Dad!" before the turn, but appellant went ahead because he thought he could beat the motorcycle. After he felt the crash, appellant reversed his truck to move away from the accident and then left the scene because he was scared. He claimed he did not see the condition of the motorcyclist and did not see him on the ground. His son wanted to get out and check on the victim, but appellant did not stop.
Appellant admitted to the detectives that he thought the victim was hurt and he "came out of it badly." Before they advised appellant that the victim had died, the *470 detectives asked appellant if he wanted to know how serious the victim's injuries were. Appellant responded, "If you want to tell me." He later stated that he was sorry but that it was also the victim's fault because he (the victim) was driving so fast.
II. Defense evidence
The defense did not call any witnesses and appellant did not testify.
DISCUSSION
I.-II.**
III. Defense Counsel's Concession of Hit and Run
During his opening statement and closing argument, defense counsel conceded appellant's guilt as to the second count of felony hit and run, focusing instead on the murder count. Appellant argues that his counsel's concession was tantamount to a guilty plea on that count. Further, because the record is silent as to whether appellant knowingly waived his right to trial on the hit and run, he contends the absence of a valid waiver requires reversal. He asserts that this error infected his murder conviction as well. We agree with appellant as to the hit and run conviction, and reverse his conviction on that count. But we find no error as to the murder conviction.
A. Factual background
Defense counsel's opening statement included an unequivocal concession on the hit and run count. He stated that appellant "caused the accident. No dispute. And then he drove away." A few moments later, he conceded, "As to the hit and run, he's guilty of it; I'll say that again at the end. There are no games being played here. ... But he's not guilty of murder." The remainder of the defense opening statement focused on the murder charge.
Similarly, in closing argument, defense counsel focused solely on the murder charge, stating that as to the hit and run charge, "I've never disputed it. He's guilty of it; he should be punished for it." In her closing, the prosecutor noted that she would not "touch on the second count, the hit and run; I think that's very obvious that he is guilty of that count."
B. Effect on hit and run conviction
1. Legal framework
"When a criminal defendant enters a guilty plea, the trial court is required to ensure that the plea is knowing and voluntary. [Citation.] As a prophylactic measure, the court must inform the defendant of three constitutional rights-the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers-and solicit a personal waiver of each." ( People v. Cross (2015) 61 Cal.4th 164, 170, 187 Cal.Rptr.3d 139, 347 P.3d 1130.) Accordingly, in the event of a guilty plea or other conduct tantamount to a plea, "the record must demonstrate that the defendant voluntarily and intelligently waived his constitutional trial rights." ( People v. Farwell (2018) 5 Cal.5th 295, 300, 234 Cal.Rptr.3d 434, 419 P.3d 913 ( Farwell ).)
Two recent cases, McCoy v. Louisiana (2018) --- U.S. ----, 138 S.Ct. 1500, 200 L.Ed.2d 821 ( McCoy ) and Farwell, supra, 5 Cal.5th 295, 234 Cal.Rptr.3d 434, 419 P.3d 913 inform our analysis here.[6] In McCoy , defense counsel informed defendant *471 of his plan to concede guilt on the commission of three murders in an attempt to avoid a death sentence for defendant. ( McCoy, supra , 138 S.Ct. at p. 1506.) The defendant insisted he did not commit the murders and adamantly objected to any admission of guilt. ( Ibid . ) During his opening statement and closing argument, over defendant's objection, defense counsel told the jury the evidence was "unambiguous," that defendant "committed three murders." ( Id . at p 1507.)
The Supreme Court concluded that "counsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission." ( McCoy , supra , 138 S.Ct. at p. 1510.) As the McCoy court noted, "some decisions ... are reserved for the client-notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." ( Id . at 1508.) Further, the trial court's error in allowing defense counsel to proceed was "structural"; "when present, such an error is not subject to harmless-error review." ( Id . at p. 1511.)
The court also distinguished Florida v. Nixon (2004) 543 U.S. 175, 186, 125 S.Ct. 551, 160 L.Ed.2d 565 ( Nixon ), in which defense counsel several times explained to the defendant a proposed concession strategy, but the defendant was unresponsive. The Nixon court held that "when counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, '[no] blanket rule demand[s] the defendant's explicit consent' to implementation of that strategy." ( McCoy, supra , 138 S.Ct. at p. 1505, quoting Nixon, supra , 543 U.S. at p. 192, 125 S.Ct. 551.)
The California Supreme Court addressed a related issue in Farwell , supra , 5 Cal.5th 295, 234 Cal.Rptr.3d 434, 419 P.3d 913. There, the defendant was charged with gross vehicular manslaughter and misdemeanor driving with a suspended license. ( Id . at p. 298, 234 Cal.Rptr.3d 434, 419 P.3d 913.) During trial, the parties entered into a stipulation admitting all the elements of the misdemeanor charge; the court later instructed the jury that it must accept the stipulated facts as true. ( Id. at pp. 298-299, 234 Cal.Rptr.3d 434, 419 P.3d 913.) The court did not advise the defendant "of the constitutional rights implicated by a guilty plea or the stipulation. Nor did it solicit a personal waiver of those rights." ( Id . at p. 299, 234 Cal.Rptr.3d 434, 419 P.3d 913.) The Supreme Court first found that a "stipulation that admits all of the elements of a charged crime necessary for a conviction is tantamount to a guilty plea." ( Ibid . ) Farwell's "stipulation conclusively established the stipulated facts as true and completely relieved the prosecution of its burden of proof on count 2. While the jury was still required to return a verdict on that count, its limited function did not amount to a jury trial in the constitutional sense." ( Id . at p. 300, 234 Cal.Rptr.3d 434, 419 P.3d 913.) "Accordingly, the record must demonstrate that the defendant voluntarily and intelligently waived his constitutional trial rights." ( Ibid . )
The court next turned to the lack of express advisements and waivers in the record. It examined the test set forth in People v. Howard (1992) 1 Cal.4th 1132, 5 Cal.Rptr.2d 268, 824 P.2d 1315 ( Howard ), which held that a plea is valid notwithstanding the lack of express advisements and waivers "if the record affirmatively shows that it is voluntary and intelligent under the totality of the circumstances." ( Id . at p. 1175, 5 Cal.Rptr.2d 268, 824 P.2d 1315 ; see also Farwell , supra , 5 Cal.5th at p. 301, 234 Cal.Rptr.3d 434, 419 P.3d 913.) The Farwell court concluded that this "totality of the circumstances" test applied "in all circumstances where the court fails, *472 either partially or completely, to advise and take waivers of the defendant's trial rights before accepting a guilty plea." ( Id . at p. 303, 234 Cal.Rptr.3d 434, 419 P.3d 913.) Applying that test, the court found there was "no affirmative evidence that Farwell understood his stipulation would conclusively establish all of the elements of the misdemeanor crime and make the guilty verdict a foregone conclusion." ( Id . at pp. 307-308, 234 Cal.Rptr.3d 434, 419 P.3d 913.)
2. Analysis
The facts of this case place it somewhere between the circumstances of McCoy and Farwell . As in McCoy , defense counsel conceded during argument that appellant committed the hit and run. This concession was tantamount to a guilty plea, as it admitted "all of the elements of a charged crime necessary for a conviction" and "relieved the prosecution of its burden of proof" on that count. ( Farwell, supra , 5 Cal.5th at pp. 299-300, 234 Cal.Rptr.3d 434, 419 P.3d 913 ; see also McCoy, supra , 138 S.Ct. 1500, 1508.) As such, defense counsel's complete concession of guilt on the hit and run count was permissible only if based on a knowing and informed waiver by appellant of his right to trial on that count. (See McCoy, supra , 138 S.Ct. 1500, 1508 ["Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence.... These are not strategic choices about how best to achieve a client's objectives; they are choices about what the client's objectives in fact are ."].)
Unlike the facts of McCoy , there is no evidence in the record that appellant objected to defense counsel's strategy. But there is also no evidence in the record that appellant was informed of counsel's decision to concede guilt on the hit and run count or, crucially, what rights he would be giving up as a result. As such, to avoid error, the record must affirmatively show that appellant's waiver was voluntary and intelligent under the totality of the circumstances. ( Farwell , supra , 5 Cal.5th at p. 300, 234 Cal.Rptr.3d 434, 419 P.3d 913 ; Howard, supra , 1 Cal.4th at p. 1180, 5 Cal.Rptr.2d 268, 824 P.2d 1315.) Moreover, as the Farwell court noted, silent record cases "face their own practical hurdle. The failure to advise a defendant of any trial rights will make it much harder to demonstrate a plea was properly accepted." ( Farwell , supra , 5 Cal.5th at p. 306, 234 Cal.Rptr.3d 434, 419 P.3d 913.) Further, "[t]he absence of express advisements is particularly troublesome" in the context of a stipulation or concession that is tantamount to a guilty plea. ( Ibid . )
As in Farwell , we find that the record fails to affirmatively show that appellant understood his counsel's concession "effectively extinguished his trial rights" as to the hit and run charge. ( Farwell , supra , 5 Cal.5th at p. 306, 234 Cal.Rptr.3d 434, 419 P.3d 913.) Although appellant was advised of his trial rights at the time of his prior guilty plea to the DUI charge in 2013, there is no indication in the record that appellant understood he was waiving those same rights by virtue of his counsel's concession during argument in this case. (See id . at pp. 306-307, 234 Cal.Rptr.3d 434, 419 P.3d 913.)
We do not doubt, as respondent claims, that defense counsel likely made the concession as a strategic decision, given the largely undisputed evidence as to the hit and run charge and the seriousness of the murder charge. However, with the guidance of McCoy and Farwell , we recognize that such a previously acceptable tactical *473 decision cannot override appellant's constitutional rights and the protections in place to ensure a knowing and voluntary waiver of those rights. Therefore, we reverse the conviction on the hit and run charge.[7]
C. Effect on murder conviction
Appellant also argues that his counsel's concession of guilt as to the hit and run charge requires reversal of the murder conviction "because the concession could be used by the jury to find, as a matter of law, implied malice." We disagree.
As an initial matter, as discussed herein, defense counsel's concession would be considered tantamount to a guilty plea only where it admitted all of the elements of the charged crime. ( Farwell, supra , 5 Cal.5th at pp. 299-300, 234 Cal.Rptr.3d 434, 419 P.3d 913 ; see also McCoy, supra , 138 S.Ct. 1500, 1508.) Appellant fails to demonstrate that this was the case for the murder charge; instead, he argues that the concession could have relieved the prosecution of its burden to prove the element of implied malice. Rather than conceding, defense counsel expressly argued to the jury that defendant was not guilty of murder and did not possess the requisite mental state.
Further, we are not persuaded by appellant's contention that the jury could have found implied malice required for the murder charge based on his post-accident conduct alone. As the jury was instructed, a hit and run in violation of Vehicle Code section 20001, subdivision (b)(2) requires proof of the following elements: (1) the defendant was involved in a vehicle accident while driving; (2) the accident caused the death of someone else; (3) the defendant "knew that he had been involved in an accident that injured another person or knew from the nature of the accident that it was probable that another person had been injured"; and (4) the defendant willfully failed to perform one or more enumerated duties, including immediately stopping at the scene of the accident, providing reasonable assistance to any injured person, providing his name and address to the other driver, and notifying police or highway patrol of the accident "without unnecessary delay." ( Veh. Code §§ 20001, 20003, 20004.) As such, the hit and run charge focused entirely on the fact of the accident and appellant's conduct afterward . Indeed, a concession as to the hit and run charge does not require an admission that appellant caused the accident. (See People v. Martinez (2017) 2 Cal.5th 1093, 1103, 218 Cal.Rptr.3d 140, 394 P.3d 1066 ["a defendant who flees the scene of an injury accident has committed a crime even if the accident was solely the result of the victim's own negligence"].)
As a result, appellant's argument depends on his theory that the jury could have based a finding of implied malice on his post-accident conduct alone . Appellant cites no authority in support of this proposition. His citation to People v. Cravens (2012) 53 Cal.4th 500, 136 Cal.Rptr.3d 40, 267 P.3d 1113 ( Cravens ) is inapposite. In Cravens , the court found substantial evidence to support a second-degree murder conviction for a defendant who delivered a deadly sucker punch at the end of a group fight. ( Id . at pp. 508-511, 136 Cal.Rptr.3d 40, 267 P.3d 1113.) In upholding the jury's finding of implied malice, the court relied on the circumstances of the attack, as well as defendant's conduct both before and after the fight, noting that his post-accident *474 callousness "bolstered the finding of implied malice." ( Id . at p. 511, 136 Cal.Rptr.3d 40, 267 P.3d 1113.)
Similarly, here, the prosecution argued at length regarding appellant's pre-accident knowledge of the dangers of drinking and driving, his decision to drive while impaired on the day of the accident, and his decision to turn in front of the motorcyclist, concluding that the evidence established that he acted with implied malice at the time of the accident. For example, she argued that the victim's death occurred because appellant "made decisions that night, knowing that they would result in hurting or killing another person, and said, 'I'll take the risk.' " She also argued that appellant's conduct in leaving the scene bolstered the showing of his disregard for human life. She did not suggest, however, that the jury could find implied malice based solely on appellant's post-accident conduct. To the contrary, in her rebuttal argument, she stated that the test for implied malice was "what was the defendant's state of mind before he committed that act?"
Moreover, appellant's counsel argued several times that his post-accident conduct was irrelevant to the malice inquiry. He told the jury that "the question isn't what happened after the accident; it's malice aforethought. ... The question is what was going on in his head before the accident."
We also reject appellant's argument that "nothing in the jury instructions prohibited the jury from finding implied malice based solely on defendant's post-accident conduct and mental state." The jury was instructed with CALCRIM No. 520, providing that the prosecution must prove that "when the defendant acted, he had a state of mind called malice aforethought," and that implied malice required a finding that "at the time he acted, he knew his act was dangerous to human life." Further, at appellant's request and over the prosecutor's objection, the court modified the instruction to include the following factors that the jury could consider to determine whether appellant acted with implied malice: "(1) A blood alcohol level above the legal limit of .08 percent; (2) Whether there is evidence of pre-drinking intent to drive; (3) Defendant's knowledge of the hazards of driving while intoxicated or under the influence of alcohol; (4) Highly dangerous driving." Notably, these factors focus on evidence prior to or at the time of the accident. We also note that the jury was instructed with CALCRIM No. 372, which provides that evidence of a defendant's flight after the crime "may show that he was aware of his guilt," but "cannot prove guilt by itself." As such, the record does not support appellant's assertion that the jury could have based its second degree murder verdict on his post-accident conduct alone.
IV. Cumulative Error***
DISPOSITION
The judgment of conviction on count one is affirmed. The conviction on count two is reversed and the matter is remanded for further proceedings consistent with this opinion.
CERTIFIED FOR PARTIAL PUBLICATION
We concur:
MANELLA, P. J.
MICON, J.†

All further statutory references herein are to the Penal Code unless otherwise indicated.

People v. Watson (1981) 30 Cal.3d 290, 179 Cal.Rptr. 43, 637 P.2d 279 (Watson ).

A prosecution expert opined that any driver would be impaired at the level of .08 percent or above. Given a hypothetical scenario matching the facts of the case, he also opined that the driver's blood alcohol content at the time of the accident would be between 0.14 and 0.16 percent.

See footnote *, ante .

Both opinions were published after the parties had completed briefing in this appeal. We granted appellant's request to allow the parties to submit supplemental letter briefs addressing McCoy . We also requested and received supplemental briefing addressing Farwell .

Appellant's argument that the imposition of consecutive sentences on the two counts violated section 654 is therefore moot.

See footnote *, ante .

Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.