Filed 7/15/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> SPENCER ALAN MARSH, <br><br>     Defendant and Appellant. | D074053 <br><br><br><br> (Super. Ct. No. SCD273759) |


APPEAL from a judgment of the Superior Court of San Diego County, Albert T. Harutunian III, Judge.  Affirmed.

Red Adam Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Allison V. Acosta, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Spencer Alan Marsh of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1), count 1) and vandalism (§ 594, subd. (a)(b)(1), count 2). The jury also found true the allegations in connection with count 1, that the deadly weapon used to commit this offense was a vehicle (Veh. Code, § 13351.5), and that defendant personally used this dangerous and deadly weapon (§ 1192.7, subd. (c)(23)); and in connection with count 2, that the amount of property damage was $400 or more. The court sentenced defendant to the midterm of three years in prison on count 1, and stayed under section 654, subdivision (a) a two-year midterm sentence on count 2.

On appeal, defendant contends that there is insufficient record evidence to support his conviction of assault with a deadly weapon; that the court prejudicially erred in instructing the jury on the meaning of the phrase "deadly weapon"; and that defense counsel violated his constitutional rights by allegedly conceding during closing argument that defendant was guilty of the vandalism charge in count 2. As we explain, we disagree with these contentions and affirm the judgment.

FACTUAL OVERVIEW

Alex P., a Navy SEAL, testified he drove a Jeep Grand Cherokee to a fitness club located in Pacific Beach at about 7:00 a.m. on June 21, 2017. Alex parked his vehicle in the back of the fitness club, near a few other vehicles including a white van. As he parked, Alex noticed a man was sitting inside the van. Alex and his wife had acquired this vehicle just a few months earlier. After validating his parking ticket inside the club,

---

[1] Unless noted otherwise, all further statutory references are to the Penal Code.

2

Alex went back outside and placed the ticket on the dashboard. As he did so, Alex noticed the man was still sitting in the van.

A little over an hour later, Alex left the club. As he approached his vehicle, Alex saw "two puddles" near the front tires, which he found "strange" because his car had been parked while he exercised inside the club. As part of his SEAL training, Alex testified they sometimes "introduce[d] malfunctions" into various vehicles in order to learn how to spot and/or repair them. One such malfunction involved the "brake lines" of a vehicle. Because it was sunny that day, Alex saw a "sheen" under the vehicle caused by the puddles.

On investigation, Alex found an "oily" liquid that was inconsistent with just water. While on the ground under the vehicle, he looked up near the tire on the driver's side and found the brake fluid line and the antilock brake system sensor had both been "cut" or "severed" at the "same spot." Concerned that this was not an accident, Alex stood up, looked around, and noticed the same man was still sitting in the driver's seat of the white van parked near his vehicle.

Alex contacted the man, hoping to find out what had happened to his vehicle. That man was defendant, who Alex identified in court. Until that day, Alex had never seen or met defendant. Alex approached the man and stated, "Hey, man. Who cut my brake lines?" Alex testified he then was "pretty upset" by what had happened, as he was concerned not only for his safety, but the safety of his wife and their "baby."

Alex testified the man's demeanor was "standoffish" as the man responded, "I don't know what you're talking about." Alex became even more upset as a result of the

3

man's response, inasmuch as the man had been sitting in his van before Alex went inside to exercise and was still sitting in his van over an hour later.  Alex testified, "And I told him that, and . . . said, 'Hey, man.  You were here the whole time.  You' — 'Somebody had blatantly went under my car and did this.  Either you did it, or you know who did it.  So what's up with my car?  Why is it like that?' "  According to Alex, the man gave the same response as before, claiming he was just living in his van.  Alex estimated he was about three or four feet from the driver's door while they were having this exchange.

After again imploring the man to tell him what had happened to his vehicle, Alex said, "All right, man.  I'm just going to call the police."  The man in the van appeared unfazed.  Alex next used his phone to take a picture of the van's license plate.  He then checked the rest of his vehicle and found the brake lines on the passenger side also had been severed in the "same linear fashion" as the driver's side.  Once he got to his feet, Alex noticed a "bunch" of surveillance cameras in the area, including one facing the parking lot.  Alex went back inside the club and contacted a manager, seeking help in determining who had intentionally damaged his vehicle.

Alex went back outside and called police on the nonemergency number.  Alex testified he was "pretty heated" when reporting the incident to police.  Shortly thereafter, the man in the white van drove away, ostensibly because the man overheard Alex reporting the crime.

Alex then tested his brakes by pushing on the vehicle's brake pedal.  Alex found there "was a little bit of pressure or pushback, which is what you want in a brake, but there wasn't a whole lot."  He then got out of the car and again checked the brakes lines.

4

Unlike before, this time "fluid was actively leaving the brake lines," which indicated to him there were "definitely brake lines issues." Alex testified the vehicle would still start even if the brakes could not stop the car once it was moving. Alex tested the brake pedal again and found he was able to get the pedal "all the way down" to the floorboard of the vehicle.

The police responded to the scene about 10 or 15 minutes after Alex's call. Alex gave a statement. The vehicle was towed to a dealership for repair, as Alex did not want to risk driving the vehicle and experiencing "possible catastrophic brake failure."

During Alex's testimony, the jury was shown a portion of the surveillance video from the parking lot camera. The video showed the white van described by Alex; Alex pulling into the lot in the Cherokee; Alex getting out of the vehicle, going inside to get his parking validated, and coming back outside to put the parking ticket on the dashboard of his vehicle; and Alex exiting the fitness club about an hour later, and shortly thereafter, engaging the man in the white van.

Hope Rubin, the manager of the fitness club, testified fitness members could park in the back of the club, obtain a parking pass that they would place inside their car, and then use the club facilities. She further testified the fitness club had a surveillance camera overlooking the entire back parking lot; a camera at each club entrance, allowing the club to see who is entering and exiting the club; and a camera at the front desk, where members check in, among other cameras inside the club. Rubin testified that video footage from the cameras streams into a computer located in her office; that she can

5

simultaneously view the video from four different cameras on her computer; that the times and dates on the videos are accurate; and that the fitness club maintains the videos.

Regarding the instant case, Rubin stated sometime in September 2017 a detective from the San Diego Police Department inquired about video footage from June 21 in connection with "someone tampering with some[one] else's car." Rubin watched the parking lot video from June 21 and then contacted another individual "who actually pulls the video and burns it to send to the detective."

Rubin testified that when she watched the video she saw "an individual slide under a car . . . like shimmy under the car on both sides"; that video from inside the fitness club showed this same individual entered the club and checked in; that the individual who "went under the car had the same physique and body type and was also wearing the same clothes as the individual who walked in the facility"; that in response to information provided by the detective, Rubin generated a "check-in record" and determined this individual was a club member; and that this member's name was "Spencer Marsh." Prior to the incident, Rubin had never seen or met either defendant or Alex.

The records from the fitness club showed defendant checked in at the club at "7:05 and 13 seconds in the morning." Additional video from the fitness club's surveillance system was shown to the jury. Rubin testified the video of a man at the front desk "holding [a] coffee cup" was the same "individual with the same clothes and the same frame as the individual who went under the car"; that video from the outdoor surveillance camera showed this same individual "go under somebody else's car"; and that thereafter this individual just sat in his car for about 38 more minutes until Alex returned to his car.

6

Jose Luis Perez testified he worked at a car dealership and assisted Alex with the repair of the Cherokee. Perez recalled that the vehicle was towed to the dealership, that it "replaced two brake lines that were — that were cut"; that even if the brake lines of this particular vehicle model were cut, the vehicle would still start and the vehicle could be driven; but that "stopping the vehicle would be an issue" because "[i]t will not brake." When asked to explain his answer, Perez testified, "The hydraulics of it will not apply, and the pressure to the brake rotors will not be there."

Perez testified that if the brake pedal went to the floorboard with no resistance, it would be a "dead-given" that the brakes were not functioning properly. Perez further testified the vehicle model driven by Alex also had a "cable-actuated emergency brake" that is activated by a brake pedal on the floorboard that connects to the rear brakes of the vehicle. Perez testified no repairs were made to the rear emergency brake of Alex's vehicle. Perez also testified that, in a hypothetical situation, if the brake lines of Alex's vehicle model were cut, there would "probably" be enough "pressure buildup on the brake system" to allow the brake pedal to be depressed in order to start the car, unless "every last bit of that fluid is drained out."

Detective Christopher Luce testified he was assigned to investigate the June 21 incident. He conducted a computer check of the license plate of the white van and found the van was registered to an individual named Spencer Marsh. Next, he examined this individual's driver's license photo and found it "closely resembled, by age, weight, and height, the suspect as described by the victim in the initial [police] report"; that using this information, he created a photographic lineup that was used to identify the individual as

7

defendant; and that he also obtained video footage from a surveillance camera located in the parking lot behind the fitness club. After reviewing that footage, Detective Luce saw the individual exit the white van and go inside the club. Detective Luce contacted the manager at the fitness club a second time and confirmed that an individual named Spencer Marsh was a member of the club and that defendant had in fact checked in at the club on the morning of the incident.

Detective Luce described what he saw on the video footage from the camera overlooking the parking lot: "From the video, I — I saw a van parked in one of the stalls right in the middle of the screen. There was a person that was sitting in it and — in the driver seat, and he was occasionally getting out of the vehicle, walking around, and doing odd things just around the vehicle. The victim's vehicle, a Jeep Cherokee, pulled up two stalls down. And the victim, [Alex], exited his car, walked into the gym for a couple minutes before coming back to his car to collect something else, like a gym bag or something, and then he went back into the gym for approximately an hour.

"During that hour period where [Alex] was away from his car, I saw the person that was sitting in the van, Mr. Marsh's van, get out of the driver seat. He walked around . . . [Alex's] car a couple times. He stood between the two vehicles facing the direction of the gym, and he kind of paced back and forth over about a ten-, fifteen-minute period. The gentleman then went to his vehicle, went to the van, gathered what looked like a blanket, and placed it under the . . . the front driver side tire of [Alex's] vehicle, laid down on it, and seemed to be laying on his back and doing something underneath the vehicle. The male then got up, went around to the front passenger side wheel, went behind that

8

wheel, laid the blanket down, and then did something under that side of the vehicle before getting back up, going to his — the — back to the van and sitting in the van."

Detective Luce estimated that defendant sat in his van for about 35 or 40 more minutes until Alex returned to his vehicle. Detective Luce noted when he initially interviewed Alex as part of the investigation, Alex stated there had been no issue between him and defendant before Alex went inside the club. Alex also told the detective that after seeing the pool of fluid under this car, he got inside, turned the car to the "on" position, and immediately saw the brake light from the dashboard illuminated, suggesting there was a problem with the brakes. According to Detective Luce, Alex then pressed on the brake pedal and found the pedal went "all the way to the floor[board]."

DISCUSSION

I

*Assault with a Deadly Weapon*

A. *Additional Background*

Here, the court instructed the jury as follows with a modified version of CALCRIM No. 875: "The defendant is charged in Count 1 with assault with a deadly weapon other than a firearm in violation of Penal Code section 245. [¶] To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person;

"2. The defendant did that act willfully;

9

"3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [AND]

"4. When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm.

"Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. [¶] The terms *application of force* and *apply force* mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind. [¶] The touching can be done indirectly by causing an object or someone else to touch the other person.

"The People are not required to prove that the defendant actually touched someone. [¶] The People are not required to prove that the defendant actually intended to use force against someone when he acted. [¶] No one needs to actually have been injured by defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault.

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"A *deadly weapon other than a firearm* is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

10

"*Present ability* means that, at the time of the act which by its nature would probably and directly result in the application of physical force upon the person of another, the perpetrator of the act must have the physical means to accomplish that result. If there is this ability, *present ability* exists even if there is no injury. *Present ability* refers to the ability of the person committing the unlawful assault and not to the external circumstances beyond his or her control which might prevent injury and thus frustrate the defendant's intent."

The court also instructed the jury that, if it was to find defendant guilty of assault with a deadly weapon, it should then consider whether the prosecution had proved the additional allegation that he used a deadly or dangerous weapon (i.e., a vehicle) in the commission of the crime. In this context, the court instructed the jury under CALCRIM No. 3145 in part as follows: "A *deadly or dangerous weapon* is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

"In deciding whether an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed, where the person who possessed the object was going, and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose."

As noted, defendant argues he did not commit an assault with a deadly weapon within the meaning of sections 245, subdivision (a)(1) (245(a)(1)) and 1192.7, subdivision (c)(23) (1192.7(c)(23)) because he did not "use" Alex's vehicle "in a manner capable of producing and likely to produce death or great bodily injury." Specifically,

11

defendant argues that Alex's vehicle with the severed brake lines did not qualify as a "deadly weapon" under sections 245(a)(1) and 1192.7(c)(23) because Alex fortunately discovered the damage and never drove his vehicle—assuming it would even start—in that condition.

B. *Guiding Principles*

In determining claims of insufficient evidence, we review the entire record in the light most favorable to the prosecution "to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Silva* (2001) 25 Cal.4th 345, 368.) "We do not resolve credibility issues or evidentiary conflicts. Instead, we presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. (*People v. Boyer* (2006) 38 Cal.4th 412, 480.)" (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1186.) "The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt. [Citations.]" (*People v. Mincey* (1992) 2 Cal.4th 408, 432.)

Section 245(a)(1) punishes assaults committed "with a deadly weapon or instrument other than a firearm."[2] Whether or not the victim is injured is immaterial because the statute focuses on use of a deadly weapon or instrument. (*People v. Aguilar*

---

[2]     Section 254(a)(1) provides in full: "Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment."

(1997) 16 Cal.4th 1023, 1028 (*Aguilar*); see *People v. Rocha* (1971) 3 Cal.3d 893, 899 [noting that assault with a deadly weapon is a general intent crime and the "intent to cause any particular injury [citation], to severely injure another, or to injure in the sense of inflicting bodily harm is not necessary" (fns. omitted)].) A " 'deadly weapon' " within the meaning of section 245(a)(1) is " 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and *likely to produce*, death or great bodily injury.' " (*Aguilar*, at pp. 1028–1029.)

"[F]or an object to qualify as a deadly weapon based on how it was used, the defendant must have used the object in a manner not only capable of producing but also likely to produce death or great bodily injury." (*In re B.M.* (2018) 6 Cal.5th 528, 530 (*B.M.*).) "Analysis of whether the defendant's manner of using the object was likely to produce death or great bodily injury necessarily calls for an assessment of potential harm in light of the evidence. . . . . [A] mere possibility of serious injury is not enough. But the evidence may show that serious injury was likely, even if it did not come to pass." (*Id.* at p. 535.)

Whether an object is a deadly weapon is a question of fact. (*People v. Moran* (1973) 33 Cal.App.3d 724, 730.) "In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.)

Our analysis on this issue is guided by our high court's recent decision of *B.M.*, *supra*, 6 Cal.5th 528. There, 17-year-old B.M. found herself locked out of her family's

home.  B.M. entered the home through a window and angrily confronted her sister Sophia about why the locks had been changed.  At some point, B.M. grabbed a "butter knife"[3] from the kitchen and went to Sophia's bedroom.  When she saw B.M. approach with the butter knife, Sophia covered herself with a blanket.  From a distance of about three feet B.M. made several downward slicing motions with the butter knife near Sophia's legs.  Although the butter knife hit Sophia's legs a few times, it did not pierce the blanket and she suffered no injury.  (*Id.* at p. 531.)

The juvenile court found that B.M.'s use of the butter knife violated section 245(a)(1), which finding was affirmed on appeal.  In reversing, our high court determined there was insufficient evidence to sustain the finding that the butter knife was used as a deadly weapon.  (*B.M.*, *supra*, 6 Cal.5th at p. 530.)  In so doing, the *B.M.* court recognized that, for an "object to qualify as a deadly weapon based on how it was used, the defendant must have used the object in a manner not only capable of producing but also *likely to produce* death or great bodily injury.  The extent of any damage done to the object and the extent of any bodily injuries caused by the object are appropriate considerations in the fact-specific inquiry required by section 245(a)(1).  But speculation without record support as to how the object could have been used or what injury might have been inflicted if the object had been used differently is not appropriate."  (*B.M.*, at p. 530.)

_____

3    Both B.M. and Sophia described the knife, which was about six inches long with a three-inch blade, a dull tip, and a slightly serrated edge, as a "butter knife."  (*B.M.*, *supra*, 6 Cal.5th at pp. 530–531.)

14

*B.M.* thus teaches that the "object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also ' "likely to produce death or great bodily injury" ' " (*B.M.*, *supra*, 6 Cal.5th at p. 533); that "likely" in this context "refers to situations in which ' " 'the probability of serious injury is great' " ' " (*ibid*); that "[a]n increase in likelihood from impossible to unlikely, for example, does not show that the object was likely to cause serious harm" (*id.* at p. 534); and that the "use of an object in a manner 'likely to produce' death or great bodily injury [citation] requires more than a mere possibility that serious injury could have resulted from the way the object was used" (*ibid.*).

*B.M.* also teaches that the "determination of whether an object is a deadly weapon under section 245(a)(1) must rest on evidence of how the defendant actually 'used' the object" rather than on conjecture as to how the object could have been used (*B.M.*, *supra*, 6 Cal.5th at p. 534); and that, while a " 'conviction for assault with a deadly weapon does not require proof of an injury or even physical contact' [citation]" (*ibid*), a "limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm" (*ibid.*).

C. *Analysis*

We conclude a jury could reasonable conclude that defendant's willful act of cutting the brake lines on Alex's vehicle was one that, by its nature, was not only " 'capable of producing' but also '*likely to produce* death or great bodily injury' " (see *B.M.*, *supra*, 6 Cal.5th at p. 533), inasmuch as driving a vehicle without the ability to stop it creates a situation in which " ' " 'the probability of serious injury is great.' " ' " (*Ibid.*)

15

That Alex discovered the severed brake lines before he drove the vehicle, and thus was not injured by defendant's act, is of no consequence for purposes of the offense of assault with a deadly weapon. (See also *People v. Williams* (2001) 26 Cal.4th 779, 787 (*Williams*) [noting "assault criminalizes conduct based on what *might* have happened — and not what *actually* happened"]; *People v. White* (2015) 241 Cal.App.4th 881, 884 [citing *Williams* in noting that an assault does not "require a specific intent to injure the victims or a substantial certainty that an application of physical force will result"]; *People v. Craig* (1991) 227 Cal.App.3d 644 (*Craig*) [finding the defendant was properly convicted under (former) section 245(a)(1) of assault with a deadly weapon or by means of force likely to produce great bodily injury as a result of his cutting the brake lines of the victim's car, even though the victim, like Alex here, never started or drove the car because she realized its brakes were not working properly]; *People v. Valdez* (1985) 175 Cal.App.3d 103, 108 [finding that shooting a firearm at a victim who is protected by bulletproof glass constitutes assault with a deadly weapon].)

Defendant nonetheless argues that a vehicle with severed brake lines is not a deadly weapon because he neither drove the car at Alex or, "more importantly, [he] did not use the car as a deadly weapon." We disagree. That defendant did not control or possess Alex's vehicle does not mean the vehicle was not a dangerous weapon under section 245(a)(1). The case of *People v. Russell* (2005) 129 Cal.App.4th 776 (*Russell*) informs our analysis on this issue.

In *Russell*, the court decided an issue of first impression when it ruled that a defendant who willfully pushed another person into the path of an oncoming vehicle had

16

"used" that vehicle as a deadly weapon for purposes of (former) section 245(a)(1). (*Russell*, *supra*, 129 Cal.App.4th at p. 778.)  The defendant in *Russell* argued he did not " 'use' the oncoming car as an instrument to cause great bodily injury to the victim because he did not have any control or operational use of the car at the time of the incident."  (*Id.* at p. 782.)

In rejecting this argument, the *Russell* court declined to "distinguish between the actions of one who, while driving or controlling a car, intentionally runs down a victim, and one who opportunistically utilizes, for the purpose of injuring a victim, the *force* of a moving car driven by an unwitting third party."  (*Russell*, *supra*, 129 Cal.App.4th at p. 782.)  The court analyzed the issue in part as follows:

"Several jurisdictions have addressed the issue of whether a defendant can be charged for assault with a deadly weapon when the defendant did not possess or control the instrumentality at the time of the assault.  Often this situation arises when a defendant intentionally strikes a part of the victim's body against a stationary object such as a wall or building fixture, or when an assailant adds to his human strength by utilizing the force of another object.  We find these cases helpful because they involve an assailant intentionally 'taking advantage' of an object's intrinsic qualities in a way likely to cause the victim great bodily harm, but without taking possession or control of that object."  (*Russell*, *supra*, 129 Cal.App.4th at pp. 782–783.)

After reviewing several cases in which a defendant had "used" an instrumentality to commit offenses despite the fact such instrumentalities were not under the defendants' direct control, the *Russell* court stated, "We agree with the above rulings, and fail to see a

17

relevant difference between one who wields a dangerous object and one who intentionally utilizes the deadly properties of a stationary or moving object for purposes of committing an assault under [former] section [245(a)(1)]." (*Russell*, *supra*, 129 Cal.App.4th at p. 785.) The court thus went on to find that pushing a victim into the path of an oncoming motor vehicle represented the " 'use' of a deadly weapon" (*ibid*), noting an "automobile weighing several thousand pounds and underway on a street is capable of seriously injuring and often killing any person it strikes." (*Ibid.*)

Similarly, defendant in the instant case "used" Alex's own vehicle as a deadly weapon when defendant purposely severed both of its brake lines. Like the *Russell* court, we decline to distinguish between one who controls or drives a vehicle in such a manner that the vehicle constitutes a deadly weapon for purposes of section 245(a)(1), and one who "intentionally utilizes" a vehicle's potential deadly properties in a way likely to cause the victim great bodily harm, despite not taking possession or control of the vehicle him- or herself. (See *Russell*, *supra*, 129 Cal.App.4th at pp. 782–785.) Clearly, a moving vehicle weighing "several thousand pounds and underway on a street" (*id.*, at p. 785), which is unable to stop because of an intentional act caused by a defendant, constitutes a "deadly weapon" within the meaning of sections 245(a)(1) and 1192.7(c)(23) that is " ' "likely to produce death or great bodily injury" ' " to the driver. (See *B.M.*, *supra*, 6 Cal.5th at p. 533.)

18

## *Instructional Error*

Defendant next contends his conviction for assault with a deadly weapon must be reversed because CALCRIM No. 875 and/or CALCRIM No. 3145 included two alternatives for establishing a deadly weapon. Specifically, he contends that it was reversible error for the court in this case to include in these instructions that a "deadly weapon other than a firearm" could be an object that is "inherently deadly," as opposed to one that "is used in such a way that it is capable of causing [and] likely to cause death or great bodily injury," because it provided jurors with two legal theories, one of which was valid (the latter) and one of which was not (the former).

We review an assertion of instructional error de novo. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.) Unlike our respected colleague, we conclude that a vehicle with severed break lines, such as Alex's Cherokee in the instant case, is not an inherently deadly weapon; thus, while the court's instructions were correct statements of the law (see *People v. Velasquez* (2012) 211 Cal.App.4th 1170, 1176 (*Velasquez*)), the inclusion of reference to an inherently deadly weapon was error. At issue is whether the error is legal in nature or factual in nature and what prejudice standard applies.

An instruction contains a legal error if it includes an incorrect statement of law; a factual error exists if an otherwise valid legal theory is not supported by the facts or evidence in a case. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1125.) An object may be either inherently deadly or deadly as used. (*Velasquez, supra*, 211 Cal.App.4th at p. 1176.) Some objects, like dirks and blackjacks, have been found inherently deadly as a

19

matter of law. (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.) Other objects, like knives and box cutters, have been found not inherently dangerous as a matter of law. (*People v. Kersey* (1957) 154 Cal.App.2d 364, 366 [knives]; *People v. McCoy* (1944) 25 Cal.2d 177, 188 [box cutters] (*McCoy*).) Because a motor vehicle is an object "commonly used for a nonviolent purpose" (see *People v. King* (2006) 38 Cal.4th 617, 624) that could qualify as dangerous when the surrounding circumstances indicate the possessor "used" it in such a manner that it was likely to cause death or great bodily injury (*B.M.*, *supra*, 6 Cal.5th at p. 533), it did not qualify as inherently deadly weapon. (See *People v. Perez* (2018) 4 Cal.5th 1055, 1065.) Thus, the inclusion of both alternatives was legal, not factual, error. (See, e.g., *People v. Stutelberg* (2018) 29 Cal.App.5th 314, 318 (*Stutelberg*); *People v. Aledamat* (2018) 20 Cal.App.5th 1149, 1154, review granted Jul. 5, 2018, S248105 (*Aledamat*).)[4]

Although the portion of the jury instructions referencing inherently deadly objects was erroneous, we conclude that error was not prejudicial under the circumstances of the instant case. In so finding, we decline defendant's invitation to adopt the standard for harmlessness employed in *Aledamat*, which requires reversal when "there is no basis in the record for concluding that the jury relied on the alternative definition of 'deadly

---

[4]     Our high court granted review in *Aledamat* to address the standard for evaluating prejudice resulting from a legal error. While we agree with *Aledamat* that this type of error is legal in nature, as noted, we disagree on the appropriate standard for prejudice, and we cite *Aledamat* solely for its persuasive value. (Cal. Rules of Court, rule 8.1115(e)(1).)

weapon' (that is, the definition looking to how a noninherently dangerous weapon was actually used)." (*Aledamat*, *supra*, 20 Cal.App.5th at p. 1154, rev. granted.)

Our high court recently found that an error in instructions on the elements of a crime is harmless "so long as the error does not vitiate *all* of the jury's findings" (*People v. Merritt* (2017) 2 Cal.5th 819, 829, 831), meaning it would be harmless error if it were "clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*Ibid.*) It also found that offering an instruction on an invalid legal theory may be harmless when " 'other aspects of the verdict or the evidence leave no reasonable doubt that the jury made findings necessary' " to convict the defendant under the alternative, valid legal theory. (*In re Martinez* (2017) 3 Cal.5th 1216, 1226, quoting *People v. Chun* (2009) 45 Cal.4th 1172, 1205.) Thus, "we apply the *Chapman* [*v. California* (1967) 386 U.S. 18 (*Chapman*)] standard to evaluate an instruction that improperly defines an element of a charged offense." (*Stutelberg*, *supra*, 29 Cal.App.5th at p. 319; *Chapman*, at p. 24.) Under that standard, an instructional error must result in reversal unless it appears beyond a reasonable doubt that the error did not contribute to the verdict. (*Stutelberg*, at p. 319.)

Turning to the instant case, we have carefully reviewed the record including the closing arguments of counsel. It shows the prosecutor *only* presented the theory that Alex's vehicle was a deadly weapon due to its manner of "use," namely defendant's

21

intentional act of severing the vehicle's brake lines.[5] Because we have concluded that a motor vehicle that has had its brake lines severed qualifies as a "deadly weapon other than a firearm"; and because neither the evidence nor the prosecutor's argument invited the jury to reach a guilty verdict on the theory that the motor vehicle, in that condition, was inherently dangerous, we conclude it is clear beyond a reasonable doubt that the jury would have reached the same verdict absent the legal error.  (See *Chapman*, *supra*, 386 U.S. at p. 24.)[6]

## III

### *Counsel's Alleged Concession of Guilt on Count 2*

Finally, defendant contends his conviction on count 2 must be reversed because his counsel's concession at the beginning of closing argument that defendant was guilty of this vandalism charge was tantamount to a guilty plea on that count.  In support of this contention, defendant relies almost exclusively on *People v. Lopez* (2018) 28 Cal.App.5th 758 (*Lopez I*).  Following briefing in the instant case, the court vacated *Lopez I*, after granting the respondent's petition for rehearing and after receiving additional briefing on the issue and found on "reexamination of this issue . . . defense counsel's statements

---

[5]    In stark contrast to the instant case, in *Aledamat* the prosecutor argued the weapon, a box cutter, was both inherently dangerous, contrary to case law (see *McCoy*, *supra*, 25 Cal.2d at p. 188), and deadly because it was used in a way capable of and likely to cause great bodily injury.  (*Aledamat*, *supra*, 20 Cal.App.5th at p. 1152, rev. granted.)

[6]    In light of our decision, we deem it unnecessary to reach the People's alternate contention that defendant on appeal forfeited this claim of error by failing to request a pinpoint instruction on the "proper legal characterization of the vehicle or to define the phrase 'inherently deadly.' "

during argument were not tantamount to a guilty plea." (See *People v. Lopez* (2019) 31 Cal.App.5th 55, 58 (*Lopez II*).

As correctly noted by the *Lopez II* court (31 Cal.App.5th at p. 63), our high court has rejected the nearly identical argument the defendant made in *Lopez I* and our defendant makes in the instant case—that a partial concession of guilt was the equivalent of a guilty plea. (See *People v. Cain* (1995) 10 Cal.4th 1, 39 (*Cain*), overruled on another ground as stated in *People v. Moon* (2005) 37 Cal.4th 1, 17.)

*Lopez II* discussed the issue as follows: "In *Cain*, defense counsel told the jury during argument that the defendant was guilty of burglary and multiple felony murder. ([*Cain*, *supra*, 10 Cal.4th] at pp. 29–30.) On appeal, the defendant argued that these statements were the equivalent of a guilty plea on those charges, and therefore that the trial court was required to obtain a plea waiver. (*Id.* at p. 30.) The court rejected this argument, holding that 'trial counsel's decision not to contest, and even expressly to concede, guilt on one or more charges at the guilt phase of a capital trial is not tantamount to a guilty plea.' (*Ibid.*) The Supreme Court has reiterated this holding in numerous cases. [Citations.]" (*Lopez II*, *supra*, 31 Cal.App.5th at pp. 63–64[7]; compare *People v. Farwell* (2018) 5 Cal.5th 295, 299 [noting a *stipulation* of the parties entered into during the defendant's trial, in which the defendant admitted all the elements of a misdemeanor charge for driving with a suspended license while still facing the more

---

7      Although noting these supreme court cases were capital cases, the *Lopez II* court found "no basis to limit the holding to capital cases, nor has appellant suggested any." (*Lopez II*, *supra*, 31 Cal.App.5th at p. 64, fn. 7.)

23

serious gross vehicular manslaughter charge, was invalid to establish guilt on the misdemeanor because the court neither advised the defendant of the constitutional rights implicated by the stipulation nor sought a "personal waiver" of such rights from the defendant].)

Here, as was the case in *Lopez II*, there was no stipulation admitting the elements of count 2 "as an evidentiary matter.  Instead, the jury was instructed that the prosecution had to prove guilt on all counts beyond a reasonable doubt and that statements by counsel were not evidence.  Thus, the prosecution was still required to present 'competent, admissible evidence establishing the essential elements' of each charge.  (*Florida v. Nixon* (2004) 543 U.S. 175, 188.)."  (*Lopez II*, *supra*, 31 Cal.App.5th at p. 64.)  Thus, defense counsel's alleged concession of guilt on count 2 did not change the prosecutor's burden of proof, or otherwise "limit the scope of the jury's role" in the instant case.  (See *ibid.*)

## DISPOSITION

The judgment is affirmed.


BENKE, Acting P. J.

I CONCUR:


NARES, J.

Aaron, J., Concurring.

Marsh intentionally severed the brake lines of the intended victim's vehicle, with the apparent intention that the victim drive the vehicle in that condition. Marsh contends that there is insufficient evidence to support his conviction for assault with a deadly weapon because there is no substantial evidence that he used the vehicle in a manner likely to produce great bodily injury, and that the trial court erred in instructing the jury on the meaning of the phrase "deadly weapon" by telling the jury that a "deadly weapon other than a firearm" could be an object that is "inherently deadly" (as opposed to one that "is used in such a way that it is capable of causing and likely to cause death or great bodily injury"). The majority concludes that there is sufficient evidence to support Marsh's conviction for assault with a deadly weapon because, as in *People v. Russell* (2005) 129 Cal.App.4th 776, in which the defendant pushed another person into the path of an oncoming vehicle, Marsh *used* the victim's vehicle as a deadly weapon. The majority further concludes that because vehicles are not inherently deadly, the trial court erred in instructing the jury that a "deadly weapon" could be an object that is "inherently deadly," but deems this instructional error harmless.

I would conclude instead that an automobile that has had its brake lines severed constitutes an inherently deadly weapon and, on that basis, I would reject Marsh's contentions on appeal.[1]

---

[1]  I specifically disagree with the majority's rejection of the standard of harmlessness set forth in *People v. Aledamat* (2018) 20 Cal.App.5th 1149, 1154, review granted July 5, 2018, S248105, which requires reversal when "there is no basis in the record for

I therefore concur in parts I and III of the majority opinion, and I concur in the result in part II.

AARON, J.

---

concluding that the jury relied on the alternative definition of 'deadly weapon' (that is, the definition looking to how a noninherently dangerous weapon was actually used)." However, that standard would have no application in a situation in which, because of its condition, the vehicle was inherently dangerous.