Filed 9/25/20  P. v. Beyer CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL ANGEL BEYER,<br><br>    Defendant and Appellant. | D077169<br><br><br>(Super. Ct. No. SCS307432) |

APPEAL from a judgment of the Superior Court of San Diego County, Stephanie Sontag, Judge.  Affirmed.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant Michael Beyer.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Eric A. Swenson and Allison V. Acosta, Deputy Attorneys General, for Plaintiff and Respondent.


Michael Beyer, who had a history of domestic violence, used his vehicle to hit his girlfriend Peggy H.'s car three times while she was driving on busy

city thoroughfares. For this conduct, he was convicted by a jury of three counts of assault with a deadly weapon in violation of Penal Code section 245, subdivision (a)(1)[1] (section 245(a)(1)) and sentenced by the trial court to eight years in prison.

On appeal, Beyer challenges the sufficiency of the evidence to support the verdict, arguing the collisions caused minimal damage and were therefore not likely to lead to great bodily injury as required to violate section 245(a)(1). Beyer also contends the trial court committed instructional error by defining "deadly weapon" to allow a conviction on the incorrect theory that a vehicle is an inherently deadly weapon. Finally, Beyer claims he committed each of the assaults with a single objective, to scare Peggy, such that the court violated section 654 when it imposed consecutive sentences for each conviction. We reject these challenges and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[2]

In March of 2019, following a domestic dispute with Peggy, Beyer followed her in his vehicle and rammed her car three times while she was traveling along major city thoroughfares in the City of Chula Vista.

At the time, Peggy was employed as a Lyft driver and was using her car, a white 2010 Hyundai Sonata, as her work vehicle. Since 2014, she had been in an on-again, off-again romantic relationship with Beyer. Their relationship was turbulent, marked by periodic episodes during which Beyer became violent and frequently threatened Peggy with death. According to Peggy, Beyer was jealous and could be provoked to rage by perceived slights

---

[1]   Undesignated statutory references are to the Penal Code.

[2]   Because Beyer's appeal implicates the substantial evidence standard of review, we state the facts in the light most favorable to the judgment. (*People v. Jennings* (2010) 50 Cal.4th 616, 638 (*Jennings*).)

such as Peggy's failure to answer her phone when he called. According to Peggy, "when he was mad, he just didn't get over it right away [and] just kept things going . . . ."

More than once, Beyer told Peggy "he was going to slit [her] from [her] vagina to [her] throat." Several times, he said he "couldn't wait to watch [her] die and to watch [her] bleed out." Peggy continued to see Beyer despite these incidents because "he's a good guy when he's not mad."

The first time Beyer threatened to kill Peggy was in June of 2015. During this incident, while yelling that he was going to kill Peggy, Beyer tried to pull her from her car by her neck, injuring her neck and nose.

In July of 2017, while Peggy was asleep, Beyer entered her house and began throwing furniture and breaking items in her bedroom. Fearing Beyer would hurt her, Peggy ran to a neighbor's house and called the police.

In September 2018, Beyer called Peggy while she was away from home. He told her he was sitting in her bedroom and that when she came home "he was going to slit [her] throat." Peggy went to the local sheriff's station and complained, but no action was taken.

In January 2019, Peggy had to leave a fishing trip with Beyer to help her daughter with a personal problem. Later that evening, still angry at Peggy for leaving their trip early, Beyer pushed a newspaper into her mouth with enough force to knock one of her teeth loose.

On March 19 and 20, 2019, Beyer sent Peggy several text messages in which he stated, "I will be happy when you're dead," "You're only going to lose your life," and "Can't wait to watch you die."

On March 22, 2019, Peggy invited Beyer to her house. One of Peggy's housemates had refused to allow Beyer in the house due to his aggressive behavior, but the housemate was not home at the time. Peggy and Beyer

3

shared a couple of beers and were intimate.  Peggy decided to confront Beyer about his death threats and asked him whether he really wanted her to die.  Rather than apologize as he typically had done in the past, Beyer refused to respond.  Peggy found his lack of response significant, an indication "that something [had] changed . . . ."

The next day, after Beyer left, Peggy noticed he had left one of his two cell phones at her house.  When she departed for work, she took Beyer's phone with her so she could return it to him later that day.

After driving for Lyft for approximately two hours, Peggy took a break and called Beyer to let him know she had his phone.  When Beyer answered, he was enraged and screaming.  Apparently, he had called Peggy several times while she was working, and she had not responded.  Peggy believed "[h]e thought . . . that I was with someone else, because I wasn't answering his phone calls . . . ."

Peggy told Beyer he could meet her at a gas station on the corner of L Street and Broadway in Chula Vista to retrieve his phone.  Peggy arrived first and was putting something in her trunk when Beyer startled her from behind.  He started screaming at her, "how can you do this to me?  We were just together" and "I'm going to prison for the rest of my life because I'm going to kill you tonight."  Peggy tried to walk away, but Beyer followed her, pointing his finger in her face and shouting that he was going to kill her.  He opened the front passenger door of Peggy's vehicle and slammed it into a cement pole five times.  When Peggy tried to pull Beyer away from her car, he turned and shoved her, causing her to trip off the gas pump platform.  Beyer's demeanor seemed more aggressive to Peggy than when he had threatened her in the past.

4

Peggy noticed that several nearby customers were watching and implored them to call the police, but none of them did. She asked the clerk inside the gas station store to call 911, but he did not respond. As Peggy entered the store, Beyer turned and walked away and told Peggy he would wait for her at her house. When she heard this, Peggy decided not to go home that evening.

Peggy got back in her car. After looking around to make sure she could not see Beyer, she pulled out from the gas station and made a right-hand turn to head west on L Street. Google map street view images of this area of L Street were admitted into evidence at trial. They showed a four-lane major commercial thoroughfare bordered by businesses with driveway access to the street and divided by a low island-style median. Video footage from one of the gas station's surveillance cameras showed Peggy's car as it exited the gas station. In this video, several cars could be seen passing in both directions on L Street before and after Peggy pulled out from the gas station.

As Peggy headed west on L Street, she looked in her rearview mirror and saw Beyer coming up from behind her in his car. Beyer had been parked at a Shell gas station on the other side of L Street, immediately opposite the gas station Peggy had used. As Peggy turned right onto L Street, Beyer pulled out from the Shell station, turning left onto the wrong side of L Street and driving against oncoming traffic to avoid the median and catch up with her.

Beyer accelerated toward Peggy's car and positioned his vehicle within inches of her car's rear bumper. As she continued west on L Street, Peggy was approaching a trolley track crossing that immediately preceded an intersection with a traffic light. A Google map street view of this area of L Street showed three westbound lanes crossed by two sets of trolley tracks and

5

bordered on both sides by utility poles and poles supporting trolley crossing arms.

Peggy was about to cross the trolley tracks when she felt Beyer's car hit hers from behind. She estimated she was going about 30 miles per hour when this occurred. The collision caused her car to move. She worried her foot might slip off the brakes and cause her car to travel onto the trolley tracks or into the intersection.

At that moment, a car in front of her made it through the intersection before the light turned red, opening a space for Peggy's vehicle on the other side of the tracks. As she pulled forward toward the intersection, Beyer hit her car from behind once again. Although Peggy was moving more slowly when Beyer struck her the second time, the impact of the second hit was harder than the first. She estimated she was going around 20 or 25 miles per hour when this collision occurred.[3]

Peggy was scared Beyer would run her off the road and considered running the red light to get away from him. She decided to get on the nearby freeway. When the light turned green, Peggy turned onto Industrial Boulevard, and Beyer continued to follow close behind her.

As Peggy was entering a freeway on-ramp near J Street at around 50 miles per hour, Beyer hit her car from behind a third time. Peggy feared Beyer would run her off the road, get her out of her car and hurt her. She decided it would be safer to avoid the freeway and turned onto J Street. Beyer continued to follow her.

---

[3]    Peggy's testimony about her speed at the time of the second collision was inconsistent. On questioning by the prosecution, she testified that she was stopped when the second collision occurred; on cross-examination, she testified that she was rolling forward at 20 to 25 miles per hour when the second collision occurred. Our factual summary reflects the account most favorable to the judgment.

At this point, Peggy called 911. She could not have done so sooner because she was keeping both hands on the steering wheel and focusing on staying on the road. After Peggy called 911, Beyer stopped following her. Peggy told the 911 dispatcher an ex-boyfriend was "literally ramming the back of my car." The dispatcher directed her to a nearby police station.

Chula Vista Police Department Officer Nathanael Hicks received the report of Peggy's call while on patrol near the intersection where the call had originated. He drove in traffic toward this location but then changed course after learning Peggy had arrived at the police station. When he met with Peggy at the station, she was very upset and seemed to believe she was still in danger despite being in a place of safety.

After arriving at the station, Peggy did not want to look at her car, explaining that "because of the impact" of "get[ting] rammed three times," she "thought the damage would be pretty bad." When she and Officer Hicks examined her car, they observed black paint transfer on its rear bumper—the front bumper of Beyer's car was black—as well as slight deformities and indentations in the bumper. This damage had not been there before the incident.

When Beyer was later arrested, he was in possession of methamphetamine paraphernalia and a usable amount of methamphetamine.

Beyer was charged in an amended information with three counts of assault with a deadly weapon (§ 245 (a)(1)) (counts 1 through 3), and one count each of making a criminal threat (§ 422) (count 4), battery of a current or former significant other (§ 243, subd. (e)(1)) (count 5), possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)) (count 6), and possession of paraphernalia used for narcotics (Health & Saf. Code, § 11364)

7

(count 7).  The jury was unable to reach a verdict on count 4, which was later dismissed in the interest of justice.  The jury found Beyer guilty as charged on all remaining counts.

The amended information further alleged that Beyer had suffered one prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and one prior serious felony conviction (§ 667 subd. (a)(1)).  At the sentencing hearing, Beyer admitted these allegations.  The court granted Beyer's motion to strike the serious felony prior and denied his motion to strike the strike prior.  The court sentenced Beyer consecutively on the three assault charges to a term of imprisonment totaling eight years and sentenced him concurrently to time served on the remaining counts.

## DISCUSSION

I.      *Substantial Evidence of Assault with a Deadly Weapon*

The jury convicted Beyer of one count of assault with a deadly weapon in violation of section 245(a)(1) for each of the three times Beyer used his vehicle to hit Peggy's car.  Beyer contends we should reverse these convictions, arguing there was insufficient evidence he used his vehicle in a way likely to lead to death or great bodily injury.

A.      *Legal Principles*

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatsoever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, quoting *People v. Bolin* (1998) 18 Cal.4th 297, 331.)  "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Zamudio*, at p. 357.)  " 'Substantial evidence includes circumstantial evidence and any

8

reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) "We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence." (*Jennings*, *supra*, 50 Cal.4th at pp. 638-639.) "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Id.* at p. 639.)

Section 245(a)(1) prohibits "an assault upon the person of another with a deadly weapon or instrument other than a firearm." "For purposes of assault with a deadly weapon under section 245(a)(1), 'a "deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury.' " (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 85-86 (*Raymundo M.*), quoting *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 (*Aguilar*).)

Cars are among those objects that are not deadly per se. (*People v. Biapakala* (2019) 34 Cal.App.5th 455, 458.) However, "[s]everal cases have recognized a vehicle as a deadly weapon based on the manner it was used. (*See, e.g., People v. Oehmigen* (2014) 232 Cal.App.4th 1, 6 [defendant drove a car at two police officers]; *People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1183 [defendant raced through a red light at a busy intersection and collided with another vehicle]; *People v. Russell* (2005) 129 Cal.App.4th 776, 787

9

(*Russell*) [defendant pushed the victim into the path of an approaching car].)"
(*People v. Perez* (2018) 4 Cal.5th 1055, 1065.)

"Whether an object is a deadly weapon is a question of fact." (*People v. Marsh* (2019) 37 Cal.App.5th 474, 485.) "In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.)

In deciding whether Beyer used his car as a deadly weapon, we follow recent guidance from the California Supreme Court clarifying what it means for an object to be used in a manner "likely to produce" death or great bodily injury. (*In re B.M.* (2018) 6 Cal.5th 528, 532-536 (*In re B.M.*).) In *In re B.M.*, a juvenile attacked her sister with a "butter knife," described as "about six inches long, with a three-inch blade that was not 'sharp' and had 'small ridges' on one side." (*Id.* at p. 531.) The juvenile made "several 'downward' 'slicing' " motions with the knife in the area around her sister's blanket-covered legs. (*Ibid.*) The knife did not pierce the blanket, and the sister was not injured. (*Id.* at pp. 531, 536.) The court found this evidence insufficient to support the determination that the juvenile had used the butter knife as a deadly weapon. (*Id.* at pp. 536-539.)

In reaching this conclusion, "[t]he *In re B.M.* court clarified the 'likely to cause' prong in several respects. First, the prong 'requires more than a mere possibility that serious injury could have resulted from the way the object was used.' [Citation.] Second, 'the determination . . . must rest on evidence of how the defendant actually "used" the object'—'conjecture' about the manner of use is impermissible. [Citation.] Third, 'the extent of actual injury or lack of injury is also relevant' because it 'may suggest that the nature of the object or the way it was used was not capable of producing or

10

likely to produce death or serious harm.' [Citation.] Finally, the court clarified that 'an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure or being removed from harm's way once an assault is already underway.' " (*Raymundo M.*, *supra*, 52 Cal.App.5th at p. 86, quoting *In re B.M.*, *supra*, 6 Cal.5th at pp. 534, 535, 537.)

B. *Analysis*

Applying these principles, we conclude substantial evidence supported the determination Beyer created a likelihood of great bodily injury each time he used his vehicle to ram Peggy's car as she was travelling on major city thoroughfares trafficked by cars and bordered by utility poles and other obstacles.

Under *Aguilar*, we first consider the dangerousness of the instrumentality used to commit the assaults. "An automobile weighing several thousand pounds and underway on a street is capable of seriously injuring and often killing any person it strikes." (*Russell*, *supra*, 129 Cal.App.4th at p. 785.) Unlike the innocuous butter knife, a car has far greater potential to cause injury and is likely to injure when not properly controlled or when intentionally propelled at another vehicle.

Beyer contends that even if cars are *generally* capable of causing serious bodily injury, the way he used his car in this case did not create a likelihood of such injury. Although Beyer admits he used his car to hit Peggy's vehicle, he refers to these collisions as mere "bumps" and argues the "extremely minimal damage" Peggy's car sustained shows he did not hit her vehicle in a way likely to seriously injure her.

We disagree. In evaluating whether a defendant's use of an object was likely to cause great bodily injury, we consider not only the degree of force

11

involved but also the manner in which the object was used and "all other facts relevant to the issue." (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.) The degree of damage actually inflicted is relevant, but not dispositive. Likewise, "the evidence may show that serious injury was likely, even if it did not come to pass." (*In re B.M.*, *supra*, 6 Cal.5th at p. 535.) Beyer's focus on the degree of force with which he struck Peggy's car ignores other relevant facts that showed his conduct was likely to cause Peggy serious harm.

At the outset, we note that Beyer's reference to the collisions as mere "bumps," a word that suggests a relatively minor impact, stems from Peggy's use of the word "bump" at trial. However, this was not the only word she used to describe the collisions. In her 911 call, Peggy reported being repeatedly "rammed" by Beyer's vehicle, a term that connotes a harder impact. The jury was entitled to credit the latter characterization of the collisions in reaching its verdict. Similarly, the jury could reasonably infer that Peggy's reluctance to look at the damage to her vehicle suggested the force of the impacts felt harder to her than the resulting damage to her vehicle indicated, and could consider this testimony in determining the degree of danger posed by the collisions.

Additionally, Beyer committed what amounted to three acts of domestic violence played out in moving cars, on city streets, creating a highly volatile situation. Beyer was enraged and had a history of physically harming Peggy while enraged. Peggy testified his behavior on this occasion was more aggressive than in the past, from which the jury could reasonably infer that when Beyer directed his aggression at Peggy on this occasion, there was a correspondingly greater likelihood Peggy would suffer injury as a result. Beyer drove menacingly close to Peggy, conduct the jury could reasonably infer was meant to, and did, instill fear. This evidence supported the

12

inference that both drivers' faculties were compromised—Beyer was in a state of rage, and Peggy was in a state of fear—thus increasing the potential for driver error and the likelihood of a harmful outcome.

Beyer's actions preceding the three collisions added to the probability of serious injury. Each time Beyer struck Peggy's car, he did so from a position as close as a couple of inches behind her. He accelerated over that small distance with enough force to damage her vehicle and did so while Peggy's car was moving. The first collision occurred while Peggy was travelling at approximately 30 miles per hour; the second while she was travelling at between 20 and 25 miles per hour; and the third while she was driving 50 miles per hour onto a freeway on-ramp. These dangerous maneuvers created a reasonable probability that each time Beyer struck Peggy's car, she would be knocked off course or lose control of her car and suffer substantial injury as a result.

Beyer contends, incorrectly, that Peggy "never testified to any concern that she would lose control of [her] car." As the record shows, she testified that after the first impact, she was scared her foot would slip off the brake and cause her car to move forward onto the trolley tracks or into the intersection ahead. She also stated that throughout the encounter, she was afraid Beyer would run her off the road and noted that she was unable to call 911 sooner because she had to keep both hands on the wheel to cope with Beyer's assaults.

The jury was entitled to regard Peggy's concerns as reasonable and as indicative of the probable outcomes of Beyer's conduct. Drifting from one's lane (as would have occurred had Peggy been run off the road or lost control of her steering wheel); advancing into an intersection against a red light (as would have occurred had Peggy's foot slipped off the brake); and the loss of

13

control over speed and direction that results when a moving car is hit (as Peggy's was), create a potential for injury that is far greater on busy city thoroughfares than on roads with no traffic.

Beyer contends the possibility Peggy could have suffered a collision with a third party's car was hypothetical, unsupported by evidence of the presence of other vehicles in the roadway. Yet, as Beyer concedes, Peggy did testify that at the time of the first collision there was a car in front of her on the other side of the tracks.

Also, Peggy's testimony as well as the gas station surveillance video established that when Beyer drove the wrong way on L Street, he passed oncoming traffic. The surveillance video also showed several vehicles passing in both directions on L Street as Peggy pulled onto L Street, which Peggy estimated was approximately one minute before the first two collisions occurred. Officer Hicks also testified that he drove in traffic when heading to the location on J Street from which Peggy had called 911. This evidence supported the inference other vehicles were in the vicinity on L Street and J Street when Beyer collided with Peggy's car. Their presence increased the likelihood the collisions would result in injury.

Beyer claims Peggy's ability to maintain control over her vehicle should be taken as an indication of the collisions' harmlessness. However, "an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure . . . once an assault is already underway." (*In re B.M.*, *supra*, 6 Cal.5th at p. 537; see *People v. Valdez* (1985) 175 Cal.App.3d 103, 113-114 [holding that shooting a gun at a victim protected by bulletproof glass constitutes assault with a deadly weapon].) That Peggy was able through her own efforts to avoid losing control of her vehicle despite Beyer's aggressions did not make his conduct any less hazardous.

14

In sum, it was all of the circumstances under which Beyer committed the collisions, and not merely the force with which he struck Peggy's car, that made his conduct so dangerous. Each time Beyer used his vehicle to hit Peggy's car, he created a likelihood of serious bodily injury even if such injury "did not come to pass." (*In re B.M.*, *supra*, 6 Cal.5th at p. 535.) Substantial evidence supported the jury's verdict.

## II. *Instructional Error*

The trial court instructed the jury with CALCRIM No. 875, which stated, among other things, that "A deadly weapon other than a firearm is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." Beyer contends that under the recent California Supreme Court decision *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*), the court erred by giving this instruction because it allowed the jury to convict him on the incorrect theory that a car is an "inherently deadly" weapon. On our de novo review (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707), we find no prejudicial error.

In *Aledamat*, the defendant used a box cutter by thrusting the blade at another man. (*Aledamat*, *supra*, 8 Cal.5th at p. 4.) The trial court instructed the jury with a version of CALCRIM No. 875 that included the same definition of "deadly weapon" at issue here. (*Aledamat*, at p. 4.) The high court held this was error. "A box cutter is a type of knife that, because it is designed to cut things and not people, is not an inherently deadly weapon as a matter of law . . . ." (*Id.* at p. 6, internal quotation marks and citation omitted.) Accordingly, "the trial court erred in presenting the jury with two theories by which it could find the box cutter a deadly weapon: (1) inherently

15

or (2) as used.  The first theory (inherently) is incorrect, but the second theory (as used) is correct."  (*Id.* at p. 7.)

A car is not an inherently deadly weapon.  (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1054.)  Accordingly, and as the People concede, under *Aledamat*, the trial court erred by instructing the jury with the "inherently deadly" theory.  The parties dispute whether this instructional error was prejudicial.  In *Aledamat*, the court held that alternative-theory errors are subject to the harmless error test established in *Chapman v. California* (1967) 386 U.S. 18, 24.  (*Aledamat, supra*, 8 Cal.5th at p. 13.)  "The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt."  (*Ibid.*)

In support of the claim that he was prejudiced, Beyer argues that because the instructions did not define "inherently deadly," the jury was likely to conclude a car is an inherently deadly weapon using its common sense understanding of the term.  He also contends the "as used" prong of the instruction (that is, the part that states, "one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury") was "analytically challenging," making the jury "eager" to convict on the erroneous "inherently deadly" theory.  Finally, he asserts that the parties' closing arguments misled the jury into relying on the "inherently deadly" theory.

Having carefully reviewed the record, we are satisfied the instructional error was harmless beyond a reasonable doubt.  First, we reject the contention the jury was likely to find Beyer's car to be an "inherently deadly weapon" without considering the manner in which it was used.  In *Aledamat*, the court addressed whether the jury's reliance on its common understanding

16

to find a box cutter "inherently deadly" was potentially prejudicial.  The court stated, "the jury must have considered the term 'inherently deadly' to mean something. . . .  [T]he theoretical risk is that, because the court did not define the term, the jury might have applied its common understanding to find the box cutter deadly because it is sharp and used for cutting.  [Citation.]  But if the jury did so, it would necessarily find the box cutter deadly in the colloquial sense of the term—i.e. readily capable of inflicting deadly harm— and that defendant used it as a weapon." (*Aledamat*, *supra*, 8 Cal.5th at p. 15.)

We perceive even less of a theoretical risk than in *Aledamat* that the jury would find a vehicle "inherently deadly" without considering its manner of use.  Cars, unlike boxcutters, do not resemble weapons.  They are highly-regulated, everyday objects that, when operated as intended, do not ordinarily lead to injury.  As in *Aledamat*, if the jury concluded Beyer's car was "inherently deadly," it necessarily would have found so "in the colloquial sense of the term—i.e. readily capable of inflicting deadly harm—and that defendant used it as a weapon." (*Aledamat*, *supra*, 8 Cal.5th at p. 15.)

Second, we reject Beyer's contention that the "as used" prong of the definition was too "analytically challenging" for the jury to apply to the facts of this case, making the jury "eager" to choose to rely instead on the alternative "inherently deadly" theory.  Beyer cites no authority in support of this position, and his argument relies on the improper assumption the jury did not faithfully discharge its duty to apply the instructions to the facts as it found them.  (*People v. Sparks* (1967) 257 Cal.App.2d 306, 309 [On review, " '[i]t will be presumed that the jurors were true to their oaths and followed the various admonitions and instructions of the court' "].)

17

Third, contrary to Beyer's assertions, the parties' closing arguments were not misleading. The prosecutor consistently adhered to the theory that Beyer's vehicle was a deadly weapon based on the way it was used, not because it was inherently deadly. She told the jury it would have to determine "can that vehicle, can that weapon—and here we have vehicle—be used in such a way likely to cause great bodily injury and/or death?" She argued Beyer's vehicle was used in a manner likely to cause death or great bodily injury: "[h]ere we have the defendant intentionally striking the victim's vehicle in one of his jealous rages that we've heard about three times. He's using that vehicle in a way that it could have resulted in great bodily injury or even death."

Beyer claims the prosecutor misled the jury when she stated: "The definition for a deadly weapon is any object, instrument, or weapon that is inherently deadly, or—*which we have in this case, I would argue*—or one that is used in such a way that it is capable of causing or likely to cause death, or . . . great bodily injury. Of course a vehicle is an object that could be used in such a way, capable of causing and likely to cause death or great bodily injury." (Italics added.) He argues the italicized words referred to the phrase that preceded them and amounted to an affirmative argument that a vehicle is inherently deadly.

Beyer's focus on these words ignores the overall context of the prosecutor's arguments, including her next full sentence in which she confirmed her intended meaning: "Of course a vehicle is an object that could be used in such a way, capable of causing and likely to cause death or great bodily injury." At worst, the phrase Beyer criticizes may have been ambiguous, but any momentary confusion that may have resulted was immediately dispelled as the prosecutor continued her argument. The

18

prosecutor did not say the words "inherently deadly" again or otherwise urge the jury to rely on the incorrect theory. Instead, she consistently and repeatedly advocated that Beyer's vehicle was deadly based on its manner of use. We do not perceive a danger that she misled the jury.

Beyer also asserts that his trial counsel "may" have misled the jury when she made the following statements during closing argument:

> "Cars. *Are vehicles inherently dangerous? Yes and no. I mean, they're very dangerous vehicles. They're huge. They weigh a lot*, but people drive them every single day. And so any bumps, nicks, fender benders, that's not going to be charged as an assault with a deadly weapon. It goes—what changes it is your intent. What is your intent? And we do not have beyond a reasonable doubt three counts of 245(a)(1) because Mr. Beyer was not using his car as a deadly weapon. That weapon, that vehicle must be used in such a way that it is capable and likely to cause death or great bodily injury. Sure. A car can be used like that." (Italics added.)

Beyer maintains that when his counsel said the italicized words, she "may have been saying that a car could be 'inherently deadly.' " We disagree; she said cars *might* be inherently *dangerous*, not that they *were* inherently *deadly*. And, Beyer focuses on these words in isolation and again ignores the meaning conveyed by their surrounding context. As the remainder of the quote demonstrates, Beyer's counsel made it abundantly clear she was urging the jury to rely on the "as used" prong of the instruction to decide whether his vehicle was a deadly weapon. In the remainder of her closing argument, she consistently argued that it was the manner in which Beyer used his vehicle that determined whether he had violated section 245(a)(1) and never used the words "inherently deadly" or otherwise urged the jury to rely on the erroneous theory. We perceive no legitimate possibility she inadvertently misled the jury.

Because we are satisfied that neither the evidence nor the arguments of counsel invited the jury to convict Beyer on the theory that his vehicle was inherently deadly, we conclude the instructional error was harmless beyond a reasonable doubt.

### III. *Sentencing Error*

Beyer contends all three collisions were committed with a single intent, and the trial court thus imposed impermissible duplicative punishment by failing to stay execution of sentence on counts 2 and 3 under section 654. We disagree.

Under section 654, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Although this provision "literally applies only where such multiple punishment arises out of multiple statutory violations produced by the 'same act or omission' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*)), in *Neal v. State of California* (1960) 55 Cal.2d 11 (*Neal*), its protections were judicially expanded to prohibit separate sentences for several offenses "if all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective . . . ." (*Harrison*, at p. 335, citing *Neal*, at p. 19; see *People v. Latimer* (1993) 5 Cal.4th 1203, 1208 [discussing *Neal*]). Under *Neal* and its progeny, " '[t]he key inquiry is whether the objective and intent attending more than one crime committed during a continuous course of conduct was the same. [Citation.]' " (*People v. Clair* (2011) 197 Cal.App.4th 949, 959 (*Clair*), quoting *People v. Meeks* (2004) 123 Cal.App.4th 695, 704.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if

20

supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

Beyer maintains he carried out his collisions with Peggy's car with a single objective, namely to scare her, and that the trial court therefore erred in sentencing him consecutively for each of his three section 245(a)(1) convictions. Beyer's argument lacks merit and is undermined by numerous cases affirming the appropriateness of separate punishment for each of a series of divisible assaults analogous to those Beyer committed here. (*People v. Perez* (1979) 23 Cal.3d 545 (*Perez*); *Harrison, supra*, 48 Cal.3d 321; *People v. Trotter* (1992) 7 Cal.App.4th 363 (*Trotter*).) Under *Perez* and *Harrison*, a defendant who commits a series of sex offenses with the sole intent of achieving sexual gratification is not entitled to a stay of execution under section 654. "To accept such a broad, overriding intent and objective to preclude punishment for otherwise clearly separate offenses would violate the statute's purpose to insure that a defendant's punishment will be commensurate with his culpability. [Citation.] It would reward the defendant who has the greater criminal ambition with a lesser punishment." (*Perez*, at p. 552.) Moreover, a "defendant should . . . not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his sexually assaultive behavior." (*Harrison*, at p. 337.)

In *Trotter*, the court extended this reasoning to a case involving multiple convictions for assault on a peace officer with a firearm. The defendant had fired a gun multiple times at a pursuing police officer, taking his second shot one minute after the first. (*Trotter, supra*, 7 Cal.App.4th at p. 366.) He argued both shots were incident to his singular objective of forcing the officer to stop his pursuit, thus precluding separate punishment

21

under section 654. (*Id.* at p. 367.) The court rejected this argument, reasoning that *Harrison* applied equally to a sequence of identical violent assaults as to a series of identical sexual assaults. (*Ibid.*) As in *Harrison*, the " 'defendant's intent to commit a number of separate base criminal acts upon his victim' " rendered section 654 inapplicable. (*Ibid.*, quoting *Harrison*, *supra*, 48 Cal.3d at pp. 337-338.) Moreover, it was "was not a case where only one volitional act gave rise to multiple offenses." (*Id.* at p. 368.) Instead, "[d]efendant's conduct became more egregious with each successive shot." (*Ibid.*) And, the defendant should " 'not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his . . . assaultive behavior.' " (*Ibid.*, quoting *Harrison*, at p. 338.)

The same analysis applies here and supports the trial court's decision to punish Beyer separately for each of the three collisions. As in *Trotter*, Beyer committed a series of separate assaults. That he may have acted with the general intent of scaring Peggy does not entitle him to a lesser sentence. Rather, as in *Trotter*, his " 'intent to commit a number of separate base criminal acts upon his victim' " (*Trotter*, *supra*, 7 Cal.App.4th at p. 367, quoting *Harrison*, *supra*, 48 Cal.3d at pp. 337-338) supports separate punishment for each such act. Moreover, as in *Trotter*, "this was not a case where only one volitional act gave rise to multiple offenses." (*Trotter,* at p. 368.) Each collision was volitional and calculated, requiring him to aim his vehicle at Peggy's and apply sufficient pressure to his accelerator to strike her car. After each collision, Beyer renewed his pursuit, reengaged and hit Peggy's car again. Like the defendant in *Trotter*, " 'instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his . . . assaultive behavior,' " (*Ibid.*, quoting *Harrison*, *supra*, 48

22

Cal.3d at p. 338) and Beyer's conduct became "more egregious" with each collision (*ibid.*).

*People v. Gaio* (2000) 81 Cal.App.4th 919 provides additional support for the trial court's sentencing decision. Under *Gaio*, " 'a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment' " where the "offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one." (*Id.* at p. 935.) Here, Beyer used his vehicle to strike Peggy's car in distinct locations at different times (estimated by Beyer's defense counsel in her sentencing memo to have occurred over the course of "a few minutes"), from which the trial court could properly find there was sufficient temporal separation between the collisions for Beyer to reflect on his conduct and to renew his intent to commit a new assault. (See *Clair*, *supra*, 197 Cal.App.4th at p. 960 [where defendant sent child pornography to the same recipients via e-mails sent 10 and 20 minutes apart, separate sentencing was appropriate because the e-mails were sufficiently temporally separated to allow the defendant to reflect on his conduct and renew his intent to commit another crime].)

Beyer contends his case is analogous to cases in which an assault is committed incident to a robbery. He cites several such cases, including *People v. Miller* (1977) 18 Cal.3d 873, 885-886, in which the court held that section 654 precluded separate punishment for an assault committed during the same course of conduct and against the same victim as a burglary. Contrary to Beyer's argument, these cases are not analogous to Beyer's conduct. Where an assault is committed incident to a robbery, the conduct underlying the assault supports both convictions. Imposing separate sentences for both the assault and the robbery would thus result in

23

duplicative punishment for the same conduct in violation of section 654. Here, each of Beyer's section 245(a)(1) convictions was supported by a different underlying collision. If Beyer was sentenced for only one, the others would go unpunished. As the *Perez* court stated, "to preclude punishment for otherwise clearly separate offenses would violate the statute's purpose to insure that a defendant's punishment will be commensurate with his culpability." (*Perez, supra*, 23 Cal.3d at p. 552.)

In sum, substantial evidence supported the trial court's finding that Beyer's three collisions were separate acts committed with distinct criminal objectives, rendering section 654 inapplicable.

DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.

24