Filed 9/30/21  P. v. Sandusky CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C091228 |
| Plaintiff and Respondent, | (Super. Ct. No. 18CF04063) |
| v. | |
| BRYAN FEDERICK SANDUSKY, | |
| Defendant and Appellant. | |

A jury found defendant Bryan Federick Sandusky guilty of assault with a deadly weapon and the trial court found true the allegations that defendant committed the offense while on bail and had served a prior prison term within the meaning of Penal Code[1] section 667.5, subdivision (b).  At the sentencing hearing, the trial court sentenced

---

[1]    All further section references are to the Penal Code unless otherwise specified.

1

defendant in the assault with a deadly weapon case (case No. 18CF04063) and two other cases.

In the first of the two other cases, defendant pled no contest to possession of a controlled substance for sale (case No. 16CF04009). In the second, defendant pled no contest to a felony count of failure to appear while on bail (case No. 18CF05428). The trial court sentenced defendant to a total prison term of eight years eight months, including one year for the prior prison term enhancement in the assault with a deadly weapon case. The trial court then stayed execution of the sentence and placed defendant on formal felony probation for five years.

Defendant raises a myriad of arguments on appeal.[2] He asserts: (1) the assault with a deadly weapon verdict is not supported by substantial evidence; (2) the trial court committed prejudicial instructional error by refusing his requested instruction that the jury could consider the absence of injury in deciding whether defendant committed assault with a deadly weapon; (3) the trial court committed prejudicial evidentiary error by precluding defendant from questioning the victim regarding the termination of his employment as a result of the incident; (4) the trial court committed prejudicial instructional error by using the confusing, misleading and argumentative term "simple assault" in the CALCRIM Nos. 915 and 3517 instructions as to the lesser included offense of assault; (5) the cumulative prejudicial impact of the trial court's errors violated his federal and state constitutional rights to due process and a fair trial; (6) the electronic search condition is unconstitutionally overbroad and must be stricken; (7) the job search condition is unconstitutionally vague and must be stricken; (8) the one-year prior prison term enhancement under section 667.5, subdivision (b) must be stricken pursuant to Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136); and (9) we should remand

---

[2] This matter was fully briefed following the filing of supplemental briefs on January 8, 2021. It was ordered to the author's June 2021 calendar of assignments.

2

for the trial court to reduce the probationary term to two years in accordance with Assembly Bill No. 1950 (2019-2020 Reg. Sess.) (Assembly Bill 1950).

We agree with defendant's Senate Bill 136 and Assembly Bill 1950 contentions but otherwise find no merit in defendant's arguments. We thus affirm the conviction but reverse the sentence and remand with directions to strike the one-year prior prison term enhancement and resentence defendant consistent with the amendment to section 1203.1, as provided in Assembly Bill 1950.

## FACTUAL AND PROCEDURAL BACKGROUND

### I

#### *The Prosecution's Case*

##### A

#### *The Victim's Testimony*

On April 28, 2018, the victim was working at a grocery store as a night crew manager. Around 2:40 a.m., defendant and a companion entered the store. A coworker told the victim that defendant's companion had shoplifted. The shoplifter left the store but defendant remained. When the victim's coworker asked defendant to leave the store, defendant turned to the victim and said "you know me. I've been here multiple times. We never had a problem." Defendant then said, " 'Let's go ahead and let's figure out this.' " Defendant, the victim, and the victim's coworker left the store together. Outside, the shoplifter was standing on the passenger side of defendant's car. The shoplifter pulled the stolen item from the backseat of defendant's car and handed it to another person on a bicycle, who quickly pedaled away. The shoplifter then got into the front passenger seat of defendant's car.

The victim moved to the front of defendant's car and attempted to take a photo of the license plate to share with the police. As he did so, the shoplifter jumped out of the car and approached the victim "in an aggressive way with his fist out" and cussing at the victim. Fearing for his life, the victim pulled a box cutter from his pocket and told the

3

shoplifter "don't get any closer because you're threatening me." Defendant, who was then seated in the driver's seat of the car, yelled at the shoplifter to get in; the shoplifter complied and closed the door. The victim put the box cutter back in his pocket and proceeded to take a picture of defendant's front license plate. As the victim bent down to the take the picture, defendant put the car in gear and accelerated forward (i.e., "c[ame] forward") toward the victim, who was approximately two and one-half feet away. The victim tried to get out of the away "but he came too fast." The car made contact with the victim's legs, jolting him backward. The victim described the contact with the car as clipping his knees and bumping him. The victim tried to push off the car to get away because he thought defendant would stop, but defendant continued to move the car forward. The victim was scared and "didn't want to get ran [*sic*] over in the way of [his] legs getting trapped underneath the car." The victim thus fell on top of the hood, pushed off the driver's side window with the palms of his hands, and rolled onto his feet, less than a foot away from the car. The car was moving toward the right, was accelerating from the time it initially made contact with the victim, and was traveling at approximately 15 miles per hour by the time the victim rolled off the car. There were no obstructions or other cars in the vicinity of defendant's car, except for a cart barn one parking spot over from the passenger side of defendant's car. After the victim rolled off the car, the car stopped approximately 50 yards away. Defendant opened his door and tauntingly told the victim "he's going to get [the victim] fired and that [the victim is] going to lose [his] job and stuff like that." Defendant then left the parking lot and the victim called the police.

The victim experienced "a little soreness" in his left knee for approximately a week but did not seek medical attention or take any medication.

On cross-examination, the victim testified he never told the 911 operator, police officer, prosecutor's investigator, or the prosecutor that he was hurt as a result of the incident and he never reported any soreness to anyone following the incident. He

4

explained he "was so pumped up" at the time of the incident, he did not feel anything. He testified, however, that his memory "was fresher when it first happened" when asked whether the jury should believe the version of the events given "to the officer when the incident just happened" or stated "a year later" after talking "to the Prosecutor four times."

The victim further testified on cross-examination that he could not recall what words he used to describe the contact with defendant's car when he spoke to the police officer on the day of the incident, but he would best describe it as "he came forward and struck me with the car." The victim also testified he never used the word "accelerated" in prior interviews to describe defendant's driving "away from the scene." After defendant's trial counsel played the body camera footage from the victim's police interview on the day of the incident, the victim acknowledged he told the officer "[he] ben[t] down to take the picture of the license, [he was] nudged with the car, [he] backed up, and then [he] went up on the hood, punched the hood, [he] rolled off the car, and then hit the window as the car drove off."

On redirect examination, the prosecutor asked the victim whether he believed there was a difference between being hurt or injured versus being in pain. The victim responded in the affirmative, explaining he believed "if you were hurt, you would have to go to the hospital" versus, "if you had a little bit of pain, it's not as serious as going to the hospital for just something." He further testified he felt the discomfort in his knee approximately a week after the incident. The prosecutor later asked the victim: "Now, we spent a good deal of time parsing through the terms I think: 'Nudge,' 'bump,' 'clip.' In your mind, are those . . . just different ways of describing the same contact with the vehicle?" The victim responded, yes. The prosecutor next asked: "So are you trying to draw any technical distinctions from one to another?" The victim responded in the negative, explaining the terms, in his mind, had the same meaning -- describing "the contact with the vehicle to [his] body." As to the cross-examination questions pertaining

5

to the victim's "acceleration" statement, the victim testified he meant the car was coming toward him at a speed "where [he] couldn't get out of [the] way."

## B

### *The Victim's Coworker's Testimony*

The victim's coworker observed the incident and testified defendant "drove the car into" the victim, the victim "flop[ped] onto the hood," defendant "h[ung] a right to take off," and then the victim "slid off the car, landed on his feet, [and] took off." When asked whether the victim was thrown up on the hood or jumped on the hood, the victim's coworker answered: "Well, the car bumped into him, and then he sort of just went like that, flopped onto the hood." The coworker explained, "I guess [the victim] didn't want his legs getting run over, so he went like that."

On cross-examination, the coworker confirmed he used the word nudge in describing the impact when he spoke to the prosecutor or the prosecutor's investigator during an interview. He further explained that defendant "didn't floor it," meaning "[h]e didn't, like, step on the accelerator and, you know." To the best of his knowledge, the victim was not injured during the incident.

## II

### *The Defense's Case*

Chico Police Officer John Nickelson testified he spoke to the victim shortly after the incident. The interview was recorded by Officer Nickelson's body camera. The victim told Officer Nickelson " 'that the car came forward and nudged [him].' "

## DISCUSSION

## I

### *The Verdict Is Supported By Substantial Evidence*

Defendant argues the verdict is not supported by substantial evidence because "[t]he only credible evidence about the contact between [defendant's] car and [the victim] showed that, when [defendant] used his car to make contact with [the victim], it was a

6

'nudge' that caused no injury to [the victim]." Thus, in defendant's view, no reasonable jury could have found beyond a reasonable doubt that defendant used his car as a deadly weapon, i.e., in a manner likely to produce death or great bodily injury. We disagree.

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- evidence that is reasonable, credible and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129.) " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

"[A] 'deadly weapon' under section 245, subdivision (a)(1) is ' "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury.' " (*People v. Perez* (2018) 4 Cal.5th 1055, 1065.) A motor vehicle does not qualify as an inherently deadly weapon because it is an object commonly used for nonviolent purposes. (*People v. Marsh* (2019) 37 Cal.App.5th 474, 489.) " 'In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of

the object, the manner in which it is used, and all other facts relevant to the issue.' " (*Perez*, at p. 1065.) Our Supreme Court recently clarified the scope of the deadly weapon inquiry.

"First, the object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also ' "*likely to produce* death or great bodily injury." ' " (*In re B.M.* (2018) 6 Cal.5th 528, 533.) Second, "the determination . . . must rest on evidence of how the defendant actually 'used' the object" rather than "conjecture as to how the object could have been used." (*Id*. at p. 534.) The court explained: "[I]t is appropriate in the deadly weapon inquiry to consider what harm could have resulted from the way the object was actually used. Analysis of whether the defendant's manner of using the object was likely to produce death or great bodily injury necessarily calls for an assessment of potential harm in light of the evidence. As noted, a mere possibility of serious injury is not enough. But the evidence may show that serious injury was likely, even if it did not come to pass." (*Id*. at p. 535.) Third, "the extent of actual injury or lack of injury is also relevant" because it "may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*Ibid*.) In that regard, "an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure . . . once an assault is already underway." (*Id.* at p. 537.)

At the outset, we note "nudge" was not the only word the victim and his coworker used to describe the incident. In addition to nudge, the victim described the impact of defendant's car as clipping his knees, bumping him, and striking him. The victim explained he used the terms interchangeably to describe the contact between the car and his body. The victim's coworker similarly used the terms nudge, bumped into, and drove into to describe the impact. The jury was thus entitled to believe the victim's and his coworker's use of the word "nudge" connotated a greater impact than defendant's interpretation of the word.

8

More importantly, defendant's focus on the victim's use of the word "nudge" as suggesting a relatively minor impact or degree of force with which he struck the victim ignores other relevant testimony and facts that showed his conduct was likely to cause the victim serious harm. The fact is the victim testified defendant drove the vehicle toward him, even though there were no obstructions or other cars in the vicinity of defendant's car, hit the victim's legs with his car and, even after the victim was jolted back by the impact, continued to accelerate toward the victim, reaching approximately 15 miles per hour by the time the victim rolled off the car. The victim testified he was scared and fell on the hood because he was fearful his legs would get trapped underneath the car. The victim's coworker similarly believed, based on his observation of the incident, that the victim likely "flopped onto the hood" because he "didn't want his legs getting run over." This testimony constitutes substantial evidence from which the jury could conclude the manner in which defendant used the car was likely to produce great bodily injury, i.e., pinning defendant's legs under the car. It was the circumstances under which defendant assaulted the victim, and not merely the force with which he struck the victim, that made his conduct dangerous.

The victim's lack of injury also does not negate the dangerousness of defendant's conduct. As our Supreme Court explained, the degree of damage actually inflicted is relevant but not dispositive because "the evidence may show that serious injury was likely, even if it did not come to pass." (*In re B.M.*, *supra*, 6 Cal.5th at p. 535.) That is the case here. Defendant does not receive the benefit of the victim fortuitously taking the defensive measure of falling on the hood to avoid great bodily injury. (*Id.* at p. 537.)

In sum, the victim's and his coworker's testimony constituted substantial evidence to support the jury's verdict that defendant used the car in a manner likely to produce great bodily injury.

9

## II

### *The Trial Court Did Not Commit Evidentiary Error*

Defendant argues the trial court committed evidentiary error under Evidence Code section 352 by precluding defendant "from asking [the victim] one 'simple' question to elicit the fact that the incident resulted in him getting fired."  Defendant posits "[t]he fact that [the victim] was fired from [the grocery store] is highly relevant exculpatory evidence that weighs on his credibility and gives him a motive to lie, fabricate and/or exaggerate" and one question would not have wasted time or confused the issues.

Evidence Code section 352 provides:  " 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'  We review a challenge to a trial court's choice to admit or exclude evidence under [Evidence Code] section 352 for abuse of discretion."  (*People v. Branch* (2001) 91 Cal.App.4th 274, 281-282.)  We conclude the trial court did not abuse its discretion.

### A

### *Relevant Factual Background*[3]

Prior to trial, the prosecution moved in limine to preclude defendant from eliciting testimony regarding the victim's employment status, as follows:  "As a result of the incident in question, the victim lost his job.  Apparently his actions in confronting the shoplifter(s) violated [the grocery store's] policy.  The People request that the defense be barred from raising this issue before the jury.  Subsequent actions by the victim's employer are not relevant to the issue(s) at trial, would tend to confuse the jury, and

---

[3]     Both parties' briefs omit substantial portions of the relevant colloquy in the record on this issue.

10

would likely be offered to raise the specter that the victim was doing something wrong or improper before he was struck by the Defendant."

Defendant's motions in limine included a category pertaining to the victim's employment records, stating: "[The victim] informed [the prosecutor] . . . that 'he got in trouble for this' and was 'laid off'. [The victim] also informed [the prosecutor] that he 'did not' pull out the box cutter from this [*sic*] pocket during the incident which is inconsistent with his statement to Officer Nickleson [*sic*] at the time of the incident. The defense intends to subpoena [the victim's] employment records involving disciplinary actions taken against [him] due to his actions on the date of the incident as it may contain potentially exculpatory evidence and is potentially impeachment evidence. Such evidence is relevant and material and it also provides [the victim] motive to lie [*sic*]."

At the pretrial hearing, the trial court asked defense counsel whether she wanted to be heard on a motion to continue. Defense counsel explained that her investigator was "en route to serve the subpoena" on the grocery store to obtain the victim's employment and disciplinary records. Defense counsel believed she would have enough time to review the records to cross-examine the victim given the assigned trial dates in the matter. The prosecution objected, noting, among other things, Code of Civil Procedure section 1985.6 allows an employee whose employment records are sought pursuant to a subpoena duces tecum an opportunity to file a motion to quash. The trial court reviewed the statute and advised defense counsel that, given the time frames and procedures outlined therein, there would be insufficient time to obtain the records prior to trial and "there was time previously to pursue the record."

The trial court next invited the parties to discuss the defense's intent to cross-examine the victim as to whether he "was disciplined or suspended based on his action." The prosecution argued the line of questioning was irrelevant because "[t]he [grocery store's] interpretation of whether or not [the victim] followed a store policy in following a shoplifter out of the store is not relevant to the charge here before the Court."

11

Defense counsel countered that the information pertained to the victim's credibility, "[i]t gives him motive to lie." Counsel explained: "If he did brandish a weapon in the course of his duties and was then disciplined for that, then that's important information because that's the defense in our case. That he brandished a weapon, and [defendant] left in a panic." The trial court tried to clarify: "I'm not understanding. So say the witness is on the stand, and you would like to ask the witness after this incident took place outside the store in the parking lot, were you subsequently disciplined by your employer?" Defense counsel responded: "Or did you lose your job? Or did you get in trouble? Yes; correct."

The trial court next asked defense counsel: "So what's the relevance of subsequently being disciplined by the employer?" Defense counsel answered: "It will -- goes to show if -- if he was honest, and he told them that, 'Yes, I pulled out the box cutter and brandished it.' Is that the reason why you were let go, or were you let go because you followed them into the parking lot? [¶] He's denying now -- twice now in the last four days -- that he pulled out the box cutter and so that's important. So then why were you let go from your job or suspended from your job or laid off, whatever his words are, just because he followed a potential alleged shoplifter out to the parking lot or was there more to it? [¶] I think that's where it goes to his motive. It goes to his credibility, and it's impeachment evidence. And again, it's premature because we're not sure how [the victim] is going to testify on direct, so we're, of course, you know . . . ."

The trial court responded: "So at this stage then the Court is going to preclude the line of inquiry under [Evidence Code section] 352 that there will be an undue consumption of time, and it's likely to confuse the jury. To the Court, the relevance is not clear enough, and it would cause further lines of inquiry that cannot be followed up with evidence that you know to be true to impeach the witness. [¶] Again, if the Court is incorrect, and the [Code of Civil Procedure] requirements do not apply in a criminal case, the Court can revisit the [Evidence Code section] 352 [issue]. Also, if there are answers

12

by the witness during trial on direct, [defense counsel], that you think the Court should revisit the Court's ruling, you can raise that issue after direct is complete. [¶] But with what we know now, if nothing changes, the Court is not inclined to allow that line of inquiry on cross-examination. It's very far [a]field, and it's such a complex issue that's based on a lot of speculation and unknown information, where in the Court's perspective there was time to pursue those issues. Here, there's no more time as far as pursuing them and stay in compliance with the code."

In response, defense counsel argued a different theory: "So, your Honor, again the evidence will show that as [defendant] was leaving the scene in the car; after [the victim] was bumped, [defendant] said, 'You're going to lose your job for this.' It was after that that [the victim] decided to call the police. [¶] So that goes to show the motive for him to call the police. He had all this time. He had a phone in his hand. He never called the cops, but he sure did right after he realized, oh, I can lose my job. It goes to motive. That's important in [defendant's] defense of this case. [¶] As to the undue consumption of time, I'm not asking to go into his entire employment history or the disciplinary action. Simply did you get in trouble for your actions the night of the incident?"

The trial court said, "you're free to argue the point to the jury about the timing the way you just explained it here [if defendant's threat to the victim is elicited on direct examination], but I don't think that necessitates then going into whether the witness did lose [his] job because we go back to there's a myriad of issues that could be completely unrelated to the conduct out in the parking lot, and it could be completely unrelated as to why there was disciplinary action."

Defense counsel then again reiterated her concerns regarding the victim's inconsistent statements pertaining to the box cutter and argued: "I think it would be important to know what did he tell his employer when he went through that employment action. Did he say, 'I pulled out the box cutter. I was wrong.' Or did he say, 'I didn't pull out the box cutter'? This whole case rests on why [defendant] did what he did, and

13

his reaction was to [the victim's reaction], which is brandishing the box cutter, which is at dispute right now." After the prosecution responded to her argument, defense counsel continued: "Your Honor, I don't think I'm focusing on what discipline he received. It was what did he say during those proceedings about the box cutter, which he has now made two separate statements. So what -- so we need know what did he tell his employer? Did he say, 'I didn't have the box cutter'? . . . [¶] So now what is his third statement? It's -- [¶] . . . [¶] . . . It's like a tiebreaker. Did he tell his employer 'I did have a box cutter'? Or did he say, 'I didn't have a box cutter'? I don't know."

The trial court responded: "Well, from the Court's perspective, it can't be a tiebreaker. As [the prosecutor] pointed out, we don't know that there was a statement at all." Defense counsel agreed: "We don't know, yes." The court continued: "The time to investigate that is past, and [defense counsel], [defendant] is vested with the ability to impeach the witness by the conflicting statements that already exist. [¶] As you had pointed out, at one time there was a statement, yes box cutter; another time, no box cutter. So you have that impeachment available to you for the trial. And any additional pursuit just -- you can see from the time we've taken on this one issue in the motion, would really consume so much time for the jury simply to get to the point of impeachment, which is evidence that you already have. [¶] And so the Court is going to deny the request for a continuance for the reasons stated." The trial court added: "Then turning to other [*sic*], and I've ruled on admissibility of the issue of discipline that that will be excluded as a line of inquiry."

Defense counsel asked whether the ruling was subject to review and the court responded: "As I said, that if after the direct evidence, if you have testimony that you think should cause the Court to revisit the issue, then we would take that up outside the presence of the jury prior to cross-examination."

The trial court later reiterated: "The Court has granted [the prosecution's] motion that loss of employment with [the grocery store] is an issue that's precluded from being

14

raised.  And I'll ask counsel to not ask questions that would cause the witness to respond with that information.  If the witness volunteers that, then we'll try to isolate the response and then just move on.  [¶] . . . [¶]  . . . It's the expectation of the Court that counsel would not ask questions that would elicit a response about loss of employment with [the grocery store]."

B

*The Trial Court Did Not Abuse Its Discretion*

Defendant asserts the victim's employment termination in connection with the incident was "highly probative impeachment evidence" because the victim "had every reason to be angry with [defendant] for 'getting him fired,' and had every reason to see to it that [defendant] would be criminally punished for the incident."  Defendant did not raise this argument in the trial court.  Defendant instead argued the testimony was relevant because:  (1) it went to the victim's credibility and potential impeachment pertaining to the victim's use of the box cutter, which was important to defendant's defense; and (2) defendant's *threat* to the victim regarding his employment during the incident "goes to show the motive for him to call the police."  Defendant does not argue that the trial court abused its discretion in finding irrelevant the bases asserted at the hearing.

Further, defendant cherry-picks a small portion of the colloquy for his repeated assertion that he sought to ask only one " 'simple' " question of the victim -- " 'did you get in trouble for your actions the night of the incident?' "  Defendant fails to set forth the full factual background on the issue and ignores the context within which the statement was made.  It is clear from the *full recitation* of the record *ante*, that defendant was *not* seeking to ask only one question with a yes or no response.  Defendant instead wanted to elicit information from the victim pertaining to what he told his employer regarding the box cutter and the reason for his termination.  Defendant's theory was that the victim was disciplined for brandishing a weapon during the incident.

15

Even assuming, however, that defendant wanted to ask only that one question for the purpose of establishing the victim's motive for ensuring defendant would be criminally punished, the trial court did not abuse its discretion in excluding it. An answer to the question would have produced speculative inferences as to the employer's reasons for disciplining or terminating the victim as a result of the incident. The " 'exclusion of evidence that produces only speculative inferences is not an abuse of discretion.' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 81.)

III

*The Instructional Error Claims*

A

*The "Lack Of Injury" Instruction Request*

Defendant asserts the trial court erred "by refusing to include the new law on 'lack of injury,' as pronounced by the Supreme Court in *In re B.M.*[, *supra*,] 6 Cal.5th [at p.] 528, in the section 245(a)(1) instruction." He also asserts the trial court was required to include the language in the instruction because of "the overwhelming evidence that [the victim] was uninjured." Defendant believes the error was prejudicial and must be reviewed under the federal harmlessness standard set forth in *Chapman*. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711] ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].)

The People assert the trial court appropriately declined to instruct the jury further on lack of injury because it would have been duplicative and argumentative, and, even if error occurred, the error was harmless when applying the state harmlessness standard set forth in *Watson*. (*People v. Watson* (1956) 46 Cal.2d 818, 836 ["a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result

16

more favorable to the appealing party would have been reached in the absence of the error"].)

We note it is unclear whether defendant is arguing that CALCRIM No. 875 is incomplete and incorrect in light of *In re B.M.* or the trial court erred in declining to give a pinpoint instruction given lack of injury was the crux of defendant's case. In either event, we do not address the merits of defendant's instructional error contention or the parties' dispute as to whether the *Chapman* or *Watson* standard applies because we conclude that, assuming but not deciding error occurred, such error was harmless under both the *Chapman* and *Watson* standards. (See *People v. Wright* (1988) 45 Cal.3d 1126, 1144 [instructional error requires reversal only if the court concludes, after an examination of the entire cause, including the evidence, that the defendant was prejudiced].)

1

*Additional Factual Background*

The trial court instructed the jury with CALCRIM No. 875, providing that, to find defendant guilty of assault with a deadly weapon, the prosecution had to prove the following elements:

"1. The defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person;

"2. The defendant did that act willfully;

"3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;

"[AND]

"4. When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm to a person;

"5. The defendant did not act in self-defense or in defense of someone else."

17

The instruction further provided: "The terms of application of force and apply force mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. [¶] The touching does not have to cause pain or injury of any kind. [¶] The touching can be done indirectly by causing an object to touch the other person. [¶] The People are not required to prove that the defendant actually touched someone. [¶] The People are not required to prove that the defendant actually intended to use force against someone when he acted. [¶] No one needs to actually have been injured by defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault, and if so, what kind of assault it was. [¶] A deadly weapon other than a firearm is any object or instrument that is used in such a way that it is capable of causing and likely to cause death or great bodily injury[.] [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

The jury was also instructed: "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider *all the evidence that was received throughout the entire trial*. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." (Italics added.)

Prior to the court instructing the jury, defense counsel twice requested a pinpoint jury instruction or modification of CALCRIM No. 875, arguing our Supreme Court established new law in *In re B.M.* that the jury could consider lack of injury to decide whether the object used was capable of producing or likely to produce great bodily injury. (*In re B.M.*, *supra*, 6 Cal.5th at p. 528.) Specifically, defendant wanted to modify the language to state the jury could consider the extent of actual injury or lack of injury,

18

along with all the other evidence, in deciding whether he committed an assault, and if so, what kind of assault it was.  The trial court denied both requests.

In the trial court's view, *In re B.M.* did not establish new law or change existing law such that the instruction needed to be modified.  Rather, it read the case to merely clarify that the fact finder may (not must) consider lack of injury and gave direction "on the parameters" as to the argument counsel may present in that area.  The trial court explained:  "[I]t seems to this Court that the California Supreme Court was re-enforcing principles long decided and well-vested in the jury instruction and spending some time in particular areas that were specific to the facts of that case. . . .  [¶]  So it's certainly an area for argument to the jury that you may consider absence of injury, but that's always been the law."

During closing argument, the prosecution addressed the issue of injury, explaining the crime did not require a touching that caused pain or injury.  "[The victim] told you, 'I was not hurt.  I was not injured.'  But he did suffer pain.  We went back and forth on that a little bit."  The prosecutor further argued:  "Given it's great mass, the human body simply cannot withstand even a low-speed impact with an automobile.  For [the victim], that means up and over or down and under.  When the car hits him, he's either hopped up on the hood or rolls off or he has to go under.  That's physics.  [¶]  These were his choices.  And although [the victim] was not injured, he said he was sore for a week.  These statements by him are not inconsistent."

Defense counsel countered:  "The question was the car driven by -- the car that was driven by [defendant], was that driven in a manner that would likely to [*sic*] cause great bodily injury or death?  And I submit to you that it was not.  Now, there has to be no actual injury but what you have to as jurors decide [is] whether in totality of the circumstances and everything taken together, was the car driven in a way that it could have -- it had the potential to cause great bodily injury or death?  [¶]  The law also says that while there -- we don't have to have an injury, but if someone was injured, you may

consider that fact along with other evidence whether the defendant committed assault. Ladies and gentlemen, here the car actually did bump [the victim], and there was no injury. No injury. Then how can this car be driven in a manner to produce great bodily injury or death, when it actually did hit and cause no injury? And that is really the crux of this case." Defense counsel further asserted the testimony reflected the car was driven at "such a low speed that [the victim] had enough time to punch the hood, punch the window, and he didn't even fall to the ground."

2

*Even If The Trial Court Erred, Defendant Suffered No Prejudice*

Defendant believes he was prejudiced by the trial court's refusal to include the "lack of injury" language in the CALCRIM No. 875 instruction because his "theory of the case was that [he], who merely 'nudged' [the victim] and caused him no injuries, could not have possibly have [*sic*] used his car as a 'deadly weapon.' " We disagree.

We evaluate the issue of prejudice arising from an instruction presumed to be erroneous by reviewing the instructions as a whole, the entire record of trial, and the arguments of counsel. (*People v. Owens* (1994) 27 Cal.App.4th 1155, 1159; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.) Our consideration of the entire cause leads us to conclude that, had the requested instruction been given, the jury would have nonetheless reached the same verdict beyond a reasonable doubt.

The jury was instructed to consider *all evidence*. "Jurors are presumed to understand and follow the court's instructions." (*People v. Holt* (1997) 15 Cal.4th 619, 662.) That is " '[t]he crucial assumption underlying our constitutional system of trial by jury.' " (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

Defendant had the opportunity to and did vehemently argue in closing that the jury should consider the victim's lack of injury in deciding whether the car was driven in a manner likely to produce great bodily injury or death. Indeed, defense counsel argued the car was driven at a low speed and the victim's lack of injury proved the car was not used

20

as a deadly weapon. The prosecution did not dispute that the victim suffered no injury, it only noted that the victim had some pain after the incident.

The lack of injury from the bump, as defendant puts it, was not the only evidence before the jury. As explained *ante*, in the substantial evidence analysis, the circumstances of the crime were not isolated to the initial contact between the car and the victim. The victim testified defendant hit the victim's legs with his car and, even after the victim was jolted back by the impact, defendant continued to accelerate toward the victim, reaching approximately 15 miles per hour by the time the victim rolled off the car. The victim was scared and fell on the hood because he was fearful his legs would get trapped underneath the car. The victim's coworker similarly believed, based on his observation of the incident, that the victim likely "flopped onto the hood" because he "didn't want his legs getting run over."

The jury was appropriately instructed that a deadly weapon is an object used in such a way that *it is capable of causing and likely to cause death or great bodily injury*, with great bodily injury being "greater than minor or moderate harm." The jury was also appropriately instructed that it was not necessary for the victim to have suffered an injury to convict defendant of assault with a deadly weapon. The jury clearly credited the victim's and his coworker's testimony in reaching the verdict. The uncontradicted testimony of these witnesses established beyond a reasonable doubt that, under the totality of the circumstances, the car, as driven by defendant, was capable of and likely to cause great bodily injury to the victim's legs. (See *People v. Russell* (2005) 129 Cal.App.4th 776, 782 ["The law makes clear a person who operates or drives a vehicle in an attempt to injure another person has committed assault with a deadly weapon, to wit, a car"].) A car, weighing several thousand pounds, certainly has a great potential to cause injury when intentionally propelled, even at a low rate of speed, at a person or object.

21

When we take the instructions, evidence, and closing arguments into account, we conclude that, even if the trial court erred, defendant suffered no prejudice under either *Watson* or *Chapman*.

B

*The Term "Simple Assault" Was Not Confusing, Misleading, Or Argumentative*

Defendant asserts the trial court erred by using "the confusing, misleading and argumentative term 'simple assault' in two instances (CALCRIM Nos. 915 and 3517)" and the error was prejudicial under the *Chapman* standard. (*Chapman v. California*, *supra*, 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].) The error, defendant posits, "minimize[d] the lesser offense of assault under section 240 and steered the jury towards the greater offense of assault with a deadly weapon under section 245(a)(1)." Anticipating the People's forfeiture argument, defendant asserts the claim is not forfeited because, even though he failed to object to the instructions at trial, the trial court has a sua sponte duty to give correct and complete instructions on lesser included offenses. He further asserts his counsel's failure to object to the trial court's modification of CALCRIM No. 915 did not constitute invited error. If the instructional error claim is deemed forfeited, however, defendant asserts his trial counsel was ineffective for failing to object to the instructions.

The People argue the claim is forfeited and, if not forfeited, it has no merit because defendant reads the single phrase out of context and he cannot establish prejudice under *Watson*. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) If the claim is forfeited, the People further assert defendant's trial counsel was not ineffective for failing to object.

We review the merits of the instructional error claim to determine whether the instructions were correct statements of the law or affected defendant's substantial rights. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012 [failure to request clarifying and amplifying instructional language does not preclude appellate review to determine

22

whether an instruction was a correct statement of law]; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087 ["we may review any instruction which affects the defendant's 'substantial rights,' with or without a trial objection."].)  We accordingly do not address the forfeiture and ineffective assistance of counsel arguments.

The problem with defendant's argument is that, "in determining the correctness of jury instructions, we consider the instructions *as a whole*."  (*People v. Friend* (2009) 47 Cal.4th 1, 49, italics added.)  Defendant does not argue that the instructions contained an incorrect statement of the law.  He instead takes issue with the inclusion of the term "simple assault" in *identifying* the lesser included offense of assault under section 240.  Indeed, the language complained of in the CALCRIM No. 915 instruction is located in the title of the instruction -- i.e., "**915. Simple Assault (Pen. Code, § 240)**" -- and in one sentence stating, "[s]imple assault is a lesser included offense of assault with a deadly weapon."  In the CALCRIM No. 3517 instruction, the term is used only once:  "Simple assault is a lesser included crime of assault with a deadly weapon."  We fail to see how the use of the term "steered the jury towards the greater offense of assault with a deadly weapon" or rendered "the jury instructions, as a whole, confusing and misleading," as defendant asserts.

We find no basis for concluding the language was confusing, misleading, or argumentative, and defendant provides no credible argument in that regard.  That attorneys have long understood the term to refer to assault under section 240 but "jurors are generally not familiar with the concept of 'simple assault' " does not assist in the analysis.  Neither does the fact that the term is not used in section 240 and CALCRIM No. 915.  Defendant's speculation that "a juror who sees the term 'simple assault' may be distracted by the term 'simple' and associate assault under section 240 with an insignificant scuffle, such as minor pushing and shoving" in the absence of a definition is just that -- speculation.  As for defendant's assertion that the trial court "violated the recommendation of rule 2.1050(d) of the California Rules of Court because it deviated

23

from the pattern jury instructions without 'find[ing]' that the term 'simple assault' 'would more accurately state the law and be understood by jurors,' " we note the rule provides a *recommendation*, not a requirement, to use the standard Judicial Council instructions. And, finally, we do not understand the point defendant tries to convey in arguing the trial court's use of the term in two different instructions renders the instructions argumentative. We simply do not understand defendant's reasoning and thus find no merit in it.

In sum, defendant fails to explain how the use of "simple assault" in the few instances at issue here constituted instructional error. We thus conclude no instructional error occurred.

## IV

### *There Was No Cumulative Error*

Defendant argues the cumulative effect of the errors in this case deprived him of due process and a fair trial in violation of his federal and state constitutional rights. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Because we have concluded defendant has failed to show any error occurred, except for the presumed but undecided error regarding the lack of injury instruction deemed unprejudicial, there was no cumulative error.

## V

### *The Probation Condition Contentions*

Defendant raises constitutional challenges to the electronic search and job search probation conditions. Defendant asserts the electronic search condition is unconstitutionally overbroad and the job search condition unconstitutionally vague. The People assert the contentions are forfeited because defendant failed to raise them in the trial court and, in any event, the contentions have no merit. Defendant counters his claims are not forfeited because he raises pure questions of law.

24

Challenges to probation conditions ordinarily must be raised in the trial court; if they are not, appellate review of those conditions will be deemed forfeited both as to reasonableness and any claim concerning its constitutionality as applied to him or her. (*People v. Welch* (1993) 5 Cal.4th 228, 234-235; *In re Sheena K.* (2007) 40 Cal.4th 875, 882, 889.) However, a defendant who did not object to a probation condition at sentencing may raise a challenge to that condition on appeal if that claim "amount[s] to a 'facial challenge' " (*In re Sheena K.*, at p. 885) because it presents a " ' "pure question[] of law that can be resolved without reference to the particular sentencing record developed in the trial court" ' " (*id*. at p. 889). Such a claim "does not require scrutiny of individual facts and circumstances but instead requires the review of abstract and generalized legal concepts -- a task that is well suited to the role of an appellate court." (*Id*. at p. 885.)

## A

### *The Electronic Search Condition Is Not Facially Overbroad*

The electronic search condition provides: "The defendant provides specific consent within the meaning of P. C. § 1546 to any law enforcement agency seeking information provided by the California Electronic Communication Protection Act. This includes consent to seize and examine call logs, texts and voicemail messages, photographs and emails, contained on any device or cloud or internet connected storage owned, operated, or controlled by the defendant, including but not limited to cell phones, computers, computer hard drives, laptops, gaming consoles, mobile devices, tablets, storage media devices, thumb drives, Micro SD cards, external hard drives, or any other electronic storage devices, by whatever law enforcement agency is seeking the information. The defendant shall also disclose any and all passwords, passcodes, password patterns, fingerprints, or other information required to gain access into any of the aforementioned devices."

Defendant analyzes and relies upon four cases to argue: "Nothing in the record indicates that any of the three cases here involved [defendant] having unlawful items on his computer, cell phone, or any recordable media, or using them in committing a crime. And nothing in the record indicates that [defendant] has any sort of criminal history related to the same. Thus, there is no nexus between the government's interests in [defendant's] rehabilitation or the protection of the public and [defendant] granting the government unfettered access to his electronic devices and media by way of this Fourth Amendment waiver condition." (Citing and discussing *In re Ricardo P.* (2019) 7 Cal.5th 1113; *People v. Appleton* (2016) 245 Cal.App.4th 717; *In re J.B.* (2015) 242 Cal.App.4th 749; *In re Stevens* (2004) 119 Cal.App.4th 1228.) The problem is that defendant presents an as-applied challenge. As explained *ante*, because defendant did not object to the condition at sentencing, we consider only whether the search condition permitting searches of a probationer's computers, recordable media and/or other electronic devices, in the abstract, and not as applied to defendant, is not sufficiently narrowly tailored to the state's legitimate interest in reformation and rehabilitation of probationers *in all possible applications*. (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 885.) The answer is to that question is "no."

Electronic search conditions are not categorically invalid. (*In re Ricardo P.*, *supra*, 7 Cal.5th at p. 1128 ["Our holding does not categorically invalidate electronics search conditions"].) Thus, although application of this search condition could be constitutionally overbroad as applied to certain probationers, in other circumstances it may be entirely appropriate and constitutional. The criminal offense or a defendant's personal history may provide a sufficient basis on which to conclude the condition is a proportional means of deterring future criminality. (*Id*. at pp. 1128-1129.) In those cases, the imposition of such probation conditions would be constitutional. Because there could be circumstances in which such a condition is appropriate, we reject the claim that the electronic search condition is facially overbroad.

26

B

*The Job Search Condition Is Not Facially Vague*

The job search condition provides: "Unless participating in a job training program, working full-time earning income, are incarcerated or in court ordered residential treatment, you are to perform a job search and submit proof of at least 7 job searches each week to your probation officer or to the Court as directed."[4]

Defendant asserts the phrase "submit proof of at least 7 job searches each week" is vague because "it is wholly unclear to any person of ordinary intelligence what is even meant by '7 job searches.' " "It is well established that a 'probation condition "must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated," if it is to withstand a [constitutional] challenge on the ground of vagueness. . . .' [Citation.] [¶] If the vagueness of a probation condition may be corrected 'without reference to the particular sentencing record developed in the trial court' [citation], an issue of law arises subject to de novo review on appeal." (*People v. Mendez* (2013) 221 Cal.App.4th 1167, 1172.) That is the case here; the argument is thus not forfeited.

"The underlying concern of the vagueness doctrine is the core due process requirement of adequate *notice*." (*People v. Lopez* (1998) 66 Cal.App.4th 615, 630.) The vagueness doctrine bars enforcement of a probation condition " ' "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." [Citation.]' [Citation.] A vague law 'not only fails to provide adequate notice to those who must observe its strictures, but also "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the

---

[4]     This is probation condition 57; defendant erroneously refers to the probation condition as 67.

attendant dangers of arbitrary and discriminatory application." ' " (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.) For a probation condition "to withstand a challenge on the ground of vagueness," it " 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated.' " (*Ibid*.)

Defendant attempts to illustrate his point by rattling off various questions as to whether a probationer must apply to seven different jobs, or contact seven different potential employers, or must submit printouts from a common job search website, or may use identical search parameters, or complies with the condition by receiving automatic daily email updates. First, we note the condition does not require a probationer to *apply* for a specific number of jobs or to submit proof that he or she did so. Second, the condition does not address search parameters or impose any requirements in that regard. Third, a reasonable common sense reading of the *whole* (instead of partial) condition requires a probationer *to perform* searches (i.e., take an action to try and find something by looking) for a job every week and to submit proof he or she did so seven times each week. The requirement is sufficiently precise for a probationer to know what is required of him or her and for a court to determine whether the condition has been willfully violated. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1117 [a probation condition must be reasonably specific]; *People v. Hall* (2017) 2 Cal.5th 494, 501 [California case law establishes "a general presumption that a violation of a probation condition must be willful"].)

As a practical matter, a job search may be done in several different ways and thus it seems reasonable not to impose specific requirements as to how it should be done. That the condition does not specify precisely how a job search should be conducted does not render the condition vague. Due process does not require that a probationer receive detailed or precise direction as to each condition -- it guards against him or her being held liable for noncompliance with an unclear probation condition. We conclude the job

search condition is sufficiently clear to avoid such a due process violation and is thus not unconstitutionally vague.

## VI

### *The One-Year Prior Prison Term Enhancement Must Be Stricken*

Defendant asserts Senate Bill 136 applies retroactively to him and requires us to strike the one-year prior prison term enhancement imposed under prior section 667.5, subdivision (b). The People agree, as do we.

Effective January 1, 2020, Senate Bill 136 amended section 667, subdivision (b) to limit application of prior prison term enhancements to only prior prison terms that were served for sexually violent offenses as defined by Welfare and Institutions Code section 6600, subdivision (b). (Stats. 2019, ch. 590, § 1.) That amendment applies retroactively to all cases not yet final on Senate Bill 136's effective date. (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341, citing *In re Estrada* (1965) 63 Cal.2d 740, 742.)

Here, the trial court imposed the one-year section 667.5, subdivision (b) prior prison term enhancement for a felony that was not a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). Defendant's case is not yet final. Therefore, as the parties agree, and we concur, defendant is entitled to the benefit of Senate Bill 136's amendment to section 667.5, subdivision (b) and the prior prison term enhancement must be stricken.

## VII

### *Assembly Bill 1950*

In supplemental briefing, defendant asserts we should remand for the trial court to reduce defendant's probation term to two years in accordance with Assembly Bill 1950, which modified section 1203.1, effective January 1, 2021. (Stats. 2020, ch. 328, § 2.) Defendant asserts the statute applies retroactively to him. The People agree, as do we.

This court recently concluded Assembly Bill 1950 applies retroactively under *In re Estrada*. (*People v. Lord* (2021) 64 Cal.App.5th 241, 244-245.) Other California

29

appellate districts have concluded the same.  (See also *People v. Stewart* (2021) 62 Cal.App.5th 1065; *People v. Sims* (2021) 59 Cal.App.5th 943.)  Because defendant's case is not yet final, defendant is entitled to resentencing to reduce his term of probation.

DISPOSITION

The judgment is affirmed as to defendant's conviction.  The sentence is reversed, and the matter remanded for resentencing consistent with the amendment to section 1203.1 and to strike the one-year prior prison term enhancement.


/s/_____
Robie, J.



We concur:



/s/_____
Blease, Acting P. J.



/s/_____
Renner, J.